Motion to strike respondent's brief submitted March 24, denied
April 21, 1954, argued October 26, 1955, reversed January 18,
petition for rehearing denied February 15, 1956

IN THE MATTER OF THE ESTATE OF JAMES H. MILLER,
DECEASED

MORAN *v.* THE BANK OF CALIFORNIA, N.A.,
AS EXECUTOR ET AL and FLOETER

269 P. 2d 524
292 P. 2d 504

*McCarty, Dickson & Swindells,* of Portland, for the motion.

*Haas & Schwabe,* of Portland, contra.

ROSSMAN, J.

This cause is before us upon a motion submitted by one of the appellants, Oregon Division of the American Cancer Society, for an order to strike the brief filed by the respondent, H. Gerald Moran, upon the following grounds:

> "1. It [Moran's brief] does not comply with Rule 13(A)6 of the Supreme Court requiring that all reference to evidence make appropriate designation of pages of the Transcript of Testimony, Bill of Exceptions or Exhibits. * * *
>
> "2. It does not comply with Rule 13(A)2 of the above court, in that the purported supplemental Statement of Facts, from pages 3 to 30 thereof, does not constitute a statement of matter omitted in the Statement of Facts of appellant, Oregon Division of the American Cancer Society. * * *
>
> "3. In it, the Respondent refers to matters that are not within the record of this case. * * *"

The respondent Moran insists that his attacked brief complies with our rules. He declares that the part which contains references to neither the exhibits nor to the transcript of evidence is a supplementary statement of the facts, and claims that his departure from the record is to matters of which the court may take judicial notice.

Rule 13(A)2 (see 190 Or 700) follows:

"2. Statement of the Case. The appellant's brief shall open with a clear and concise statement of the case, which statement should not contain a detailed recital of the facts.

"If the respondent is not satisfied with appellant's statement of the facts, he may file a supplemental statement of the matter omitted which he deems essential to an understanding of the questions presented, in which event he shall point out with particularity the defects and inaccuracies, if any, in appellant's statement of facts."

Rule 13(A)6 (190 Or 703) follows:

"6. Page References to Evidence. The briefs, in referring to the evidence, must make appropriate designation of pages of the transcript of testimony or bill of exceptions, or, in case of an exhibit, the identification number or letter of the same. The following abbreviations may be used: Tr. for transcript of testimony; B.E. for bill of exceptions; Ab. for abstract; and Ex. for exhibit."

The appellants have filed three briefs. We shall pause for a moment upon them. The brief submitted by the appellant, Oregon Division of the American Cancer Society, begins with a section entitled Statement of the Case. Its opening words are:

"This is an appeal from a decree invalidating a document dated April 19, 1951, as the Last Will and Testament of James H. Miller, deceased, and declaring he died testate under a document dated April 7, 1951."

The statement is 19 pages long. The sentence which we quoted is succeeded by several short paragraphs which (1) name the beneficiaries and executor of the contested will; (2) state the appraised value of the

decedent's estate; (3) identify the proponents of the challenged will and its successful contestant; (4) recite tersely the attack which the contestant made in the circuit court upon the will; and (5) name the appellants. The foregoing which introduces the case to the court and gives the latter a quick grasp of the appeal occupies less than two pages of the brief. Those passages are followed by 17 pages of narrative which the writer of the brief deemed pertinent. This narrative affords the court an impression of the decedent, of his money-making activities, of his experiences with the contestant and of the final chapter of his life in which he fought unsuccessfully his last illness and consulted advisors concerning the disposition which he, as a bachelor without known relatives, should make of his estate.

Two more of the appellants, the Bank of California and the Board of Trustees of Leland Stanford Junior University, united in a brief. The latter begins with a segment entitled Statement of the Case, eight pages long. That part seeks to develop more clearly the issues in which the two appellants who submitted the brief are interested. It mentions some facts unfavorable to the contestant (respondent). Those facts appear to be involved in controversy. This part of the brief gives occasional citations to the transcript of evidence. A fourth appellant, the State Board of Control, filed a short brief which begins with a "Statement". The latter apparently is intended to usher in the State's assignments of error.

After the above briefs had been filed, the respondent Moran presented his, 206 pages in length. It is the one which is challenged by the motion under consideration. A part entitled Foreword opens the brief. Then comes a segment, 28 pages long, which begins

with the heading, Supplementary Statement of the Facts. The first few paragraphs of that segment are biographical in character. Seemingly the facts which they narrate of the birth of the decedent in Latvia and the hard work which he did as a toiler in the Oregon woods while he was conducting simultaneously successful operations in Portland brokerage houses are not involved in dispute. The larger part of the so-called Supplementary Statement of the Facts dwells upon the last three years of the decedent's life. It describes the decedent's association with the contestant Moran and reviews evidence which reveals how the decedent became acquainted with the physicians and attorneys who served him shortly before his death. The 28 pages under scrutiny contain no citations to the transcript of evidence or other part of the record. They are well written and, if accepted by the reader as accurate, incline the mind in favor of the respondent Moran. To indicate the nature of this part of the brief, we take from it the following:

"Greenberg telephoned Dr. Jesse Ray on Monday, April 16th to inquire how Miller was getting along, in response to which Dr. Ray told him that it was just a matter of time, that the man was dying, that he did not know how long he would last, and also that 'incidentally, he is sorer than hell at you and this stockbroker Moran.' When asked why, he quoted Miller as saying, 'well, he signed a paper but doesn't remember what he signed,' and added 'ANYWAY, HE'S CRAZY AS A LOON, ANYHOW.' Dr. Ray did not deny this conversation or the words just quoted."

We made the above resume of the opening parts of the briefs for the purpose of indicating that the three sets of brief writers have divergent views of the requirements of Rule 13(A)2 and 6 of this court.

■ *Bires v. Barney,* 203 Or 107, 258 P2d 120, sets forth the requirements imposed upon brief writers by Rule 13(A)2 and 6. The demands of those parts of Rule 13 are simple, but possibly compliance with the requirements is not easy. Rule 13(A)2 and 6 is designed to gain for this court, at the beginning of the appellant's brief, an epitome of the case and its issues. It is not intended that detail should be incorporated in the statement of the case, and clearly nothing of a controversial nature should be inserted in the statement. Anyone performing appellate work, upon picking up an appellant's brief, is gratified when he finds at the very beginning of it a short passage which acquaints him with the case, the parties to the appeal, and designates in general the issues submitted to the court. The statement should denote the nature of the case by using a phrase such as "This is an action of trespass". In a few words it should give an impression of the issues which were presented to the trial court, as, for example, "The plaintiff charged the defendant with negligence and the defendant countered with a general denial and averments of contributory negligence." Obviously, the statement of the case ought to state whether the parties, or one of them, invoked trial by jury. If the case was set for trial before a jury, the statement of the case should disclose whether a nonsuit was granted or whether the trial judge directed the verdict. If the jury itself was responsible for its verdict, the statement should say in whose favor the verdict was returned. If the case was tried without a jury, the statement should indicate whether disposition was made of the case upon the pleadings or whether the court entered findings of fact. In all likelihood, the author of the statement of the case will find it necessary to add a few additional facts so that a

ready grasp of the appeal will be afforded. His basic purpose should be to introduce the case to the reviewing court and give a sufficient background of the challenged decree or judgment so that the reader can cope with the pages that follow. Brevity is highly desirable. Possibly the writer, in preparing his statement, will find it difficult to eschew advocacy and partisanship, but his writing will lose its point and do him little service if he introduces into it matters that are controversial. Argument and clarifying material must be reserved for later pages. In the preparation of the statement of the case, the attorney for the appellant should be for the time being a veritable amicus curiae. He should forget his client and center his full attention upon the seven members of this court. His purpose should be to produce a short statement of such an informative and impartial nature that his adversary will not have to add to it.

In 18 Fordham Law Review 30, a former member of the New York bench, who has returned to the handling of litigation, publishes a dissertation entitled "Appellate Briefs and Advocacy." By resort to a quotation from a brief which was submitted to a New York appellate court, he gives the following example of a statement of the case:

> " 'The defendant has appealed from a judgment in favor of the plaintiff in the sum of $10,146.88 entered after a trial in the Supreme Court, Kings County, before Nova, J., and a jury. Two jurors dissented. The cause of action alleged in the complaint arose out of an injury sustained in the yard of a public school which the plaintiff attended, when a ball, thrown by someone, possibly another pupil, hit him in the face, destroying the sight of one eye and impairing that of the other. Negligence on the defendant's part purports to be premised

on want of supervision over the children at play. The answer is a general denial.' "

In 39 American Bar Association Journal 13, a capable member of the Detroit bar, who recently published a work entitled "Effective Legal Writing", makes recommendations that can be employed in a statement of a case.

■ We now return to the case before us. The briefs, we believe, have gone beyond the requirements of Rule 13(A)2 and 6. With the exception of the one filed by the State, they include in the statement of the case reviews of evidence which are not contemplated by our rule. The fact that they have gone beyond the requirements of our rule is not a censurable fault, but, by glancing over the remaining parts of the briefs, we observe that repetition has resulted from first including in the statement of the case a resume of the evidence. Later, when the writer of the brief argues the assignments of error, he resorts again to some of the evidence which he included in the statement of the case. In this day of costly printing and multiplication of the number of appeals filed with the court, repetition is an evil.

The absence of citations to the record in the challenged part of the brief filed by the respondent Moran is a serious defect. The author of those pages states that the facts which they narrate are free from dispute. Without attempting to be exhaustive, we compared some of the statements in his brief with corresponding parts in the brief submitted by the appellants, Cancer Society and Bank of California. In some instances the statements do not correspond. In will contest cases nuances and inconsistencies, even though they do not amount to contradictions, are often important.

It will be recalled that the motion under consideration is based in part upon a charge that the brief filed by the respondent Moran departs from the record. We have examined the charge and believe that the departures are trivial and incapable of misleading.

The only part of the brief of the respondent Moran which gives us concern is the 27 pages which contain no citations to the record. The entire brief consists of 206 pages. All of it should not be stricken because a minor part is defective. The pages which we have described cannot be deemed a statement of the case, nor can they be regarded as a supplementary statement of the case. The 27 pages are well written and we believe that their penman intended that they should predispose the reader to the cause of the respondent Moran. Succeeding parts of the brief which argue the assignments of error revert to facts which are included in these defective pages and there, after dwelling upon their significance, give citations to the transcript of evidence. In that way, the needed citations are finally incorporated into the brief, but costly repetition of doubtful merit resulted from that method of handling the facts.

From the foregoing it is seen that the respondents' "Statement of the Case" includes material which is foreign to our Rule's requirements and that the extraneous material has the vice of giving no citations to the transcript until it repeats itself in later parts of the brief.

We believe that it is best to deny the motion to strike and to postpone action upon the infraction of our rules until the time has come to tax costs. Since the facts which are stated without citation are later repeated with proper citation, no one will be misled or subjected to serious inconvenience. In the event that

the case takes a turn wherein the respondents are awarded costs, the appellants may at that time again call our attention to the defective 27 pages.

In the meantime, we express the fond, but despairing, hope that the bar, before writing briefs, will give at least a glance at our rules. The sole purpose of our rules is to produce better briefs. We add that better briefs may yield better decisions and thereby in the end gain for the state better law.

Motion denied.

## ON THE MERITS

## On The Merits

■■■■■■■■

*E. F. Bernard,* of Portland, argued the cause for appellants The Bank of California and Board of Trustees of Leland Stanford Junior University. On the brief were Pipes & McKenna; Collier, Bernard, Bernard & Edwards; and Hart, Spencer, McCulloch, Rockwood & Davies. Edwin J. Welsh, McCarty, Dickson & Swindells, of Portland, filed a brief for appellant Oregon Division of the American Cancer Society and Robert Y. Thornton, Attorney General for the State of Oregon, and Catherine Zorn, Assistant Attorney General, of Salem, filed a brief for appellant State Board of Control of the State of Oregon, for and on behalf of the State of Oregon School for the Blind.

*P. A. Schwabe* argued the cause for respondent. On the brief were Haas & Schwabe, of Portland.

■■■■■■■■

LATOURETTE, J.

This is an appeal by The Bank of California, the American Cancer Society, the Stanford University Medical School, and the State of Oregon School for the Blind, from a decree invalidating the will of James H. Miller, deceased, which was executed on April 19, 1951. The bank was named executor and the other three appellants were named the sole beneficiaries under the will.

The will was set aside at the behest of H. Gerald Moran, the sole beneficiary of a will made by Miller on April 7, 1951. The grounds of the contest are lack of testamentary capacity and insane delusions of the testator and undue influence on the part of unidentified

individuals and the subscribing witnesses to the will under contest.

Miller was born in Latvia and entered the United States around the year 1905. He never married and had no relatives in the United States. He made his living working in logging camps and at the time of his death in Portland on April 20, 1951, had accumulated by hard work and wise investments an estate of approximately $95,000.

Contestant Moran arrived in Portland in June of 1948 as an employee of Merrill Lynch, Pierce, Fenner & Beane, an investment house. A confidential business relationship developed between Moran and Miller in October of 1950 when Moran began to look after Miller's investments which the brokerage house was handling.

On December 11, 1950, Dr. Jesse L. Ray operated on Miller at the Physicians & Surgeons hospital in Portland and found that he had an incurable cancer of the bile ducts. Miller was informed of his condition and was released from the hospital.

On April 3, 1951, Miller returned to the hospital accompanied by Moran. On April 4, 1951, Moran brought David H. Greenberg, an attorney, to the hospital to confer with Miller concerning a will. Greenberg returned to his office and drew up a will for Miller's signature which named Moran as executor and sole beneficiary of his estate and designated Greenberg as attorney for the estate. Greenberg returned to the hospital the next day, but Miller did not sign the will that day for the reason that, as explained by Greenberg, "He was upset and was not in the right frame of mind to execute a will."

Miller remained in the Physicians & Surgeons hos-

pital until April 7, 1951. On the morning of that day, on account of his toxic condition, Miller became agitated and upset to such an extent that he could not be kept in his room. He was thereupon transferred to the Fairlawn hospital where there were more adequate facilities for keeping him. He was immediately put in a waist restraint in order to keep him in bed. In the afternoon of that day Greenberg gave Moran the unexecuted will. Moran proceeded to the Fairlawn hospital and had Miller sign the same in the presence of two nurses who witnessed the document.

While Miller was in the Fairlawn hospital he was under the immediate and constant care of Dr. Wendell H. Hutchens. He complained to Dr. Hutchens about Moran having him sign a paper which he did not get to see but thought was a power of attorney. He also told the doctor that he was afraid Moran was going to get into his strong box and get his money or some bonds that he had. He wanted the doctor to call the police and requested that Moran not be allowed to visit him. Dr. Hutchens felt very keenly about the matter and recognized that there was a problem in which Miller's interests had to be protected. He asked Miller if he knew any attorney in whom he had confidence and Miller said that he had never done business with an attorney but that he had done business with The Bank of California and a brokerage firm in the Wilcox building. Dr. Hutchens then called Dr. Ray and told him of the conversation. Dr. Ray, through a third party, called C. Laird McKenna and on the 19th day of April, 1951, he and Mr. McKenna went over to the Fairlawn hospital to see Miller. Thereupon McKenna drew the will in controversy, which Miller executed in the presence of McKenna and Dr. Ray as witnesses. Miller died on April 20, 1951.

TESTAMENTARY CAPACITY OF DECEDENT

■ The first question to be resolved is whether or not Miller was legally competent to execute the will presently before us. A great deal has been written about the criteria of testamentary capacity. As said in *In re State of Riggs,* 120 Or 38, 48, 241 P 70, "No particular degree of acumen will serve as a standard for testamentary capacity. Each case is to be decided upon its own facts and circumstances. The question is, Was the will the free and intelligent product of the testator's mind or not?" See *In re Estate of Verd Hill,* 198 Or 307, 256 P2d 735.

■ The right to dispose of one's property by will is inviolate. This dispositive right is a valuable incident to ownership and the law will give effect to the disposition so long as the testator has an intelligent and conscious part in the bestowal and so long as no undue influence or fraud is perpetrated whereby an unconscionable advantage is taken through the wicked designs of another. See *Holman's Will,* 42 Or 345, 356, 70 P 908.

■ There is no question but what Miller was a very sick man so far as his physical condition was concerned up to and including the day the will was executed, but this fact did not incapacitate him from making a will provided he had possession of his mental faculties and understood the business in which he was engaged. As said in *Chrisman v. Chrisman,* 16 Or 127, 138, 18 P 6, "The test is the integrity of the mind, not the body."

Dr. Hutchens, the resident psychiatrist at Fairlawn hospital, who had Miller under close scrutiny and observation during the two weeks Miller was in the Fairlawn hospital, conducted a thorough psychiatric examination of Miller. He testified that in his opinion

Miller was mentally competent to make the will in controversy.

Mary R. Smith, a graduate psychiatric nurse employed at the Fairlawn hospital, saw Miller three or four times a day from and including April 8, 1951, up to the time of his death, except on each Tuesday and Thursday afternoons and testified that when she saw him he was rational, responsive to questions and spoke coherently.

Dr. Ray, Miller's regular physician and a witness to the will, testified that when Miller signed the will he knew what he was signing, that he had comprehension of what he was doing, that his mind was clear, that he had general knowledge of the property that he owned and where it was located, and that the fact that he died the day after signing the will was not inconsistent with his testamentary capacity the day before.

C. Laird McKenna, a highly respected member of the bar, drew and witnessed the will in question. He testified that he spent over an hour with Miller at the time of the preparation and execution of the will. He also testified that Miller told him that he had cash, stocks and bonds, and a savings account and safety deposit box in The Bank of California, and that he had considerable money in securities at Merrill Lynch, Fenner & Beane and some money in the office of the hospital. He said he wasn't sure what he had left because "Mr. Moran of Merrill Lynch had swindled him into signing a power of attorney and had taken his keys. He didn't think that The Bank of California would let him into the box because they were honest, but that he did want to make a will."

When Miller told McKenna he wanted to make a will, McKenna asked him how he wanted to dispose of his property and told him that he could make a will

disposing of his property any way he wanted. Miller replied that he wanted to leave his things to charity. He said he wanted to help people who were suffering like he was and wanted to leave some to the American Cancer Society and he wanted to do something for Dr. Ray's medical school at Stanford. McKenna asked him why he wanted to leave the medical school money and Miller told him that Dr. Ray was a good doctor and had been so kind to him that he wanted to do something for Dr. Ray's school. McKenna then asked him if there was anyone else he wanted to remember and Miller said he bought papers from a blind man in Portland and that blind people had a hard time and he would like to do something for them. McKenna then suggested the state school for the blind at 82nd and Glisan streets and Miller said that was what he wanted. Miller told him that he wanted to divide the property, giving one-third to each. McKenna told him that he would have to name an executor and that the Bank of California was qualified. Miller told him that he would like to have the bank act as executor. While this conversation was going on, McKenna made some notes on a pad which he had with him. He told Miller that he would have to return to his office and type up the will and that he would bring it out the next day. Miller wanted the will drawn at once so McKenna wrote the same out in longhand. McKenna testified that after the will was written he read the same to Miller word for word and asked Miller as he went over each portion if that was what he wanted and Miller answered yes. McKenna testified that when he was reading the will, he held it where Miller could see the words and that Miller signed the will in his presence and in the presence of Dr. Ray.

After the will was signed and executed, McKenna

asked him what he wanted to do with the will. Miller told him to give it to the Bank of California. McKenna further testified that Miller comprehended what was going on, that he knew he was making a will, and that he had sufficient comprehension to know about his property.

Charles E. Timpson was employed as a male attendant at the Fairlawn hospital at the time Miller was confined there. His duties included looking after Miller's welfare, bathing him, shaving him and otherwise giving him such help as he needed. He testified that when Miller was admitted he was confused, but after two or three days, "snapped out of it." He said Moran brought him fruit which he did not want and Miller asked him to remove it from his room and told Timpson that if he had anything to do with it, to keep Moran away from him. Timpson testified that he did not see Miller on the 18th or 19th of April, 1951, but up to that time he was rational.

Contestant called no witnesses to testify as to the mental competency of Miller. Moran visited Miller for the last time on April 15, 1951, and he did not testify that he was incompetent at that time. It is alleged that Miller was mentally incompetent to make a will "subsequent to April 15, 1951." All the testimony in this case is that Miller had testamentary capacity when he executed the will.

In his brief respondent does, however, challenge the credibility of Dr. Hutchens on the ground that he "owed this patient [Miller] to Dr. Ray by referral," and because of alleged inconsistencies in his testimony. This entire line of argument does not appeal to us. We have carefully considered the entire record and feel the charges are basically groundless. Our conclusion is particularly fortified by the appraisal of Dr. Hutchens

in respondent's brief, wherein it is stated, "Respondent intends to cast no personal reflection on Dr. Hutchens who is highly regarded in his special field of psychiatric medicine."

Respondent also challenges the credibility of Dr. Ray. It is claimed that his truthfulness was affected by the fact that his alma mater, Stanford University, was one of the beneficiaries under the will and that he had told Greenberg in a telephone conversation on April 16, 1951, that Miller was "as crazy as a loon." No effort was made on the part of respondent at the trial to directly attack the credibility of Dr. Ray. Dr. Ray's testimony discloses that after Miller had left the Physicians & Surgeons hospital he visited Dr. Ray in his office upon a number of occasions and that on one such occasion a conversation was had regarding the disposition of his property upon his death. We quote from Dr. Ray's testimony:

"A. Well, as I stated, he said he wanted to—being that he had cancer, maybe if he could give it to somebody that could do some research work, it might help someone else, and I told him, 'Well, there are a lot of places that could use it, Cancer Society, and medical school, and a great many others,' and he asked me then what medical school I attended, and I told him that I attended Stanford University, and he said 'Well, I think they have turned out a good doctor, and I would like to help them some, too.' And that is the only thing that he ever told me about any charities, just the Cancer Society and the medical school, Stanford Medical School, and I told him that if he felt that way, that he ought to see his attorney and get it taken care of; and then just before he had this last illness, he talked to me again about it, and when he left the office I said, 'Well, now, you see your attorney and get this straightened out. You do just what you want with it.'"

The above testimony regarding Stanford University and Dr. Ray's being a good doctor was corroborated by the testimony of McKenna. He testified that on April 19, 1951, he had a conversation with Miller in which Miller stated "that Dr. Ray was a good doctor and had been so kind to me that I want to do something for Dr. Ray's school."

It is next claimed that Dr. Ray's estimate of the testamentary capacity of Miller was negated by a statement he made to Greenberg over the telephone on April 16, 1951, that Miller was "as crazy as a loon." Dr. Ray did not deny this conversation. The undisputed evidence is that Dr. Ray did not see Miller after he entered the Fairlawn hospital on April 7, 1951, until April 19, 1951, the day of the execution of the will. However, he did see him the day before the execution of the will of April 7, 1951, when Miller was still at the Physicians & Surgeons hospital. He testified that the nurse called him that night and told him that Miller was agitated and upset, and he was toxic from the infection he had, and that he wouldn't stay in his room. He further testified that he was in constant contact with the nurses and Dr. Hutchens concerning Miller while he was in the Fairlawn hospital. Undoubtedly Dr. Ray knew of Miller's condition the day that the Moran will was signed. Therefore, when Dr. Ray said that Miller was "as crazy as a loon," he obviously was referring to Miller's condition on April 7, 1951.

It is said that the entry on the hospital chart on the morning of the day of the execution of the will shows the mental incompetency of Miller. The 5:30 a.m. entry is "very hard to get from bathroom to bed, very unsteady on feet, much weaker. States he is very dizzy." The 4:00 p.m. entry after the will was executed was that Moran "hemorrhaged from nose and mouth."

All of the chart entries have reference to the physical condition of Miller, with the possible exception of his being dizzy. The fact that a person is dizzy does not necessarily mean that he is mentally incompetent. Dizziness can very well come from physical disability. In view of the overwhelming testimony in the case that Miller was competent at the time he executed the will, this, in our opinion, has very little bearing on the matter.

It is argued that since Miller gave the names of his brothers to Greenberg when Greenberg was preparing the first will and did not give them to McKenna when he was drawing the last will, it is evident Miller was mentally incompetent at the time the last will was drawn. Greenberg testified as follows:

"* * * I asked him who his relatives were if he had any. Well, he said he had some relatives over in Latvia, but he hadn't heard from them for over 20 years and as far as he knew the Russians had them, and he didn't think they were alive. I asked him their names, and he gave them to me in this foreign dialect, and I couldn't figure them out at all; so I asked him if he could, if he would get out of bed and write them down, and he said sure, he could do that; so I had a piece of yellow paper which I put on the dresser, gave him a pencil, he climbed out of bed and wrote out the names of his three brothers."

With respect to Miller's relatives, McKenna's testimony is as follows:

"* * * I asked him if he had any relatives in Latvia or in this country, and he said he had none in this country, and that to his knowledge he had none in—didn't remember any in Latvia."

It will be noted that Greenberg pointedly asked Miller the names of his relatives, whereas McKenna asked him if he had any relatives in Latvia or in this

country. Since Moran thought that his three brothers in Latvia were dead and McKenna did not ask him their names, as did Greenberg, the fact that he did not name them to McKenna is, in our opinion, of little significance.

## UNDUE INFLUENCE

The trial court made no finding on undue influence. The contest petition alleges that undue influence was exercised by unidentified individuals and the subscribing witnesses to the will. As above indicated, McKenna was a subscribing witness. The trial court had the following to say about McKenna, "I wish to particularly say that I have known Laird McKenna all of my adult life and most of my boyhood life, at least since the time I was 13 or 14 years of age, and I have absolutely no reservation of any kind when I say that Mr. McKenna acted in the utmost good faith in this matter." The following statement is made in respondent's brief, "Respondent has no intention or desire to question or reflect in any way upon Mr. McKenna's integrity, nor to insinuate that Mr. McKenna did anything wrong in the part he played in this affair."

Dr. Ray, the other witness to the will, did not see Miller after he left the Physicians & Surgeons hospital until the morning of the day the will was executed and then in the presence of Mr. McKenna. There is no evidence that Dr. Ray in this instance exerted any influence whatsoever on Miller. Certainly there is no evidence of undue influence on the part of Dr. Hutchens. It is not surprising that the trial judge gave no consideration to this phase of the case.

## INSANE DELUSIONS

Although insane delusions was one of the allegations of contest, respondent treated the matter in his

brief in a very cursory manner. In his brief, which consists of over 200 pages, merely a page and a half were devoted to this subject. The argument deals chiefly with the proposition that Miller's suspicions of Moran were not well founded. Respondent cited no law on the subject. The leading case on insane delusions is *Potter v. Jones,* 20 Or 239, 25 P 769. In passing, it may be noted that the writer's revered father, Chas. D. Latourette, participated in that early case as an attorney. That case has been cited repeatedly by the decisions of this court, the last of which is *In re Estate of Verd Hill,* supra. Quoting from the Jones case, we find:

"* * * The circumstances which he relates, and upon which his belief is founded, fix the place, identify the person and the manner of the improper meeting, and there is no evidence to show, nor is there any attempt to deny, that there was such a place or person or that such a meeting might not have occurred, only that the adulterous purpose which he ascribed and professed to believe to be the object of such meeting was so absolutely inconsistent with her known character for chastity to be utterly unworthy of belief and only to be accounted for in him upon the theory of an unnatural dislike or aversion which amounted to an insane delusion. The evidence in contradiction of his belief proceeds on the assumption that there may have been such a place and a man and meeting; and if so, her known character for chastity, her every-day walk and life, render it impossible that it could have occured for the foul purposes which he imputes, or otherwise than accidentally and without concert or evil design in thought or deed. But these facts, however falsely or unjustly he may have reasoned from them, or however absurd his conclusions, as applied to the wife and contestant impugned by them, nevertheless furnished the evidence which inspired his suspicions and the ground upon which his be-

lief was founded. It is conceded that the conclusions he drew from the facts are wholly unwarranted and without any justification, indicating at least an unrelenting jealous disposition; but unjust and absurd as they may be, they were not the pure creations of a perverted imagination, without any foundation in reality. Delusions are conceptions that originate spontaneously in the mind without evidence of any kind to support them, and can be accounted for on no reasonable hypothesis. The mind that is so disordered imagines something to exist or imputes the existence of an offense which no rational person would believe to exist or to have been committed without some kind of evidence to support it. They are as baseless as the fabric of a dream conjured into existence by a disordered or perverted imagination, without any sort of foundation in fact. As in Smee v. Smee, L. R. 5 Prob. Div. 84, the testator imagined himself to be the son of George IV, and that when he was born a large sum of money had been put in his father's hands for him, but which his father, in fraud of his rights, had distributed to his brothers; or, as in Smith v. Sebbitt, L. R. 1 Prob. Div. 398, the testatrix imagined herself to be one of the persons of the Trinity, and her chief legatee to be another. In cases like these the belief is the offspring of a disordered mind, and not induced by the existence of any facts or occurrences which could lend any sort of countenance to it. * * * * *''

In the first place, this suspicion concerning Moran did not spring up spontaneously in the mind of Miller. He harbored his suspicions over a period of weeks and related them not only to Dr. Hutchens and Dr. Ray, but to McKenna and Charles E. Timpson.

According to the Jones case, if there was any extrinsic evidence of any kind which inspired Miller's suspicions, even if unwarranted, his delusions could not be said to be insane delusions. The record shows

that Moran, as an employee of the brokerage firm, had it in his power upon verbal authorization to buy and sell securities for Miller. On the 7th day of February, 1951, he sold $55,000 worth of securities for Miller and on March 19, 1951, he purchased $32,500 worth of Pacific Gas and Electric stock, and on April 9, 1951, he purchased for Miller's account a thousand shares of Mountain States Power for $11,000. The record further discloses that at one time during Miller's illness Moran had in his possession approximately $732 belonging to Miller and that he also had in his possession Miller's keys, clothing and personal effects. There is substantial evidence in the record that Miller thought he had signed a power of attorney to Moran on April 7, 1951.

No matter how innocent and upright Moran's association with Miller had been in the above particulars, it must be conceded that these contacts furnished Miller with evidence which "inspired his suspicions and the ground upon which his belief was founded." They were not "as baseless as the fabric of a dream conjured into existence by a disordered or perverted imagination."

We have given careful consideration to the other matters set out in respondent's brief. We do not believe them meritorious, and therefore, have not discussed them for the reason that it would unnecessarily prolong this opinion.

■ In our opinion, the will under contest was the legal will of Miller.

In view of the result reached in this case, the award of attorney's fees in the trial court can not be sustained. *In the Matter of the Estate of Peter Lappy, Deceased,* 202 Or 571, 277 P2d 781.

Reversed.