557 So.2d 760 (1989)
In the Matter of the ESTATE OF Lois M. VICK, Deceased.
Willola Vick SULLIVANT, Jane Vick Nicholas, and Lois Ellen Nicholas
v.
C. Conner VICK.
No. 07-58454.
Supreme Court of Mississippi.
September 20, 1989.
Rehearing Denied March 28, 1990.
*761 Willola Vick Sullivant, pro se, Germantown, Tenn.
Thomas H. Pearson, Allan D. Shackelford, Clarksdale, for appellant.
D. Briggs Smith, Jr., Smith Phillips & Mitchell, Batesville, for appellee.
Before HAWKINS, P.J., and ANDERSON and BLASS, JJ.
HAWKINS, Presiding Justice for the Court:
This is an appeal by one of the proponents of the Will of Mrs. Lois M. Vick following a jury verdict and decree of the chancery court of the Second Judicial District of Panola County setting aside the Will because of undue influence. The record reveals there was a misrepresentation of an extrinsic fact which undoubtedly caused Mrs. Vick to execute the Will she did. We find there was ample evidence to support the jury verdict, and although there was an erroneous instruction given, it was harmless error. We accordingly affirm.

FACTS
Samuel B. Vick and Lois Monteith Vick married in 1919. She was a graduate of the University of Mississippi. The two lived in the second judicial district of Panola County in the Pope community. Mr. Vick accumulated considerable real and personal property over the years, at one time owning 1,500 acres near the Enid Reservoir, but approximately one-half of this acreage had been conveyed at the time of his death.
Mr. and Mrs. Vick had seven children: (1) Sam Vick, Jr., (2) Hugh Monteith (Montie) Vick, (3) Marvin E. Vick, (4) Lois Ann Vick Wallace, (5) C. Conner Vick, (6) Jane Ellen Vick Nicholas, and (7) Willola Vick Sullivant.
When the children became adult, with the exception of Conner, all moved away. Sam, Jr., lived in Jackson, Mississippi, Montie in Monroe, Louisiana, Marvin and Lois Ann in Memphis, Jane Ellen in Wichita Falls, Texas, and Willola in Germantown, Tennessee.
In the 1970s Mr. Vick owned approximately 750 acres of land, all of it in his name only. Conner, living nearby, looked after his parents' needs. Mrs. Vick suffered a stroke in the '60s or early '70s and was confined to a wheelchair. She also developed active diabetes requiring regular insulin injections. Until 1981 Conner administered Mrs. Vick's insulin shots. Mr. Vick's health likewise deteriorated, and by 1980 he was almost completely blind. Conner gradually took over his father's entire farming operations, such as were carried on.
Whether justified or not, the children became suspicious that Conner was attempting to get all or a part of Mr. Vick's land for himself. Mrs. Vick had written one of the girls complaining that Conner's family did nothing to help them, and again wrote that Conner was demanding to buy part of the "Monteith place." Also, Jane's daughter Lois Ellen Nicholas moved into the Vick home in 1972 and lived with her grandparents until 1983. She testified that she had heard Conner upon many occasions screaming at Mrs. Vick to deed him the property, and Mrs. Vick begging him to give her the insulin shot and leave her alone. This background distrust precipitated a letter to Conner dated August 7, 1978, signed by all the other children, informing him that their parents were not able to *762 negotiate with him about their property, and hoping he would not put pressure on them. They also stated their feeling that any business transaction should be made with "the full knowledge of all their children," and expressing doubt that any "major transactions that they would conduct at this point and under the circumstances would have any legal validity." Finally, they told him they did not want to work against him, but believed that all the children should be involved in any negotiations he proposed, and "thought you would like to know how we feel about this."
Following this letter the relations between the children deteriorated to open hostility and animousity, especially on the part of the two girls Jane and Willola, towards the boys. It was their feeling that Mr. Vick had favored the boys and shortchanged the girls.
On June 9, 1980, Mrs. Vick wrote one of the children that Willola had come by and "then balled me out  I mean cursed me for everything, I never even heard of." Further in this chatty, two-page letter, Mrs. Vick, in apparent reference to Willola, wrote, "She needs help badly  and talk to Mr. Sam about land. I keep out of that. She really wants to move in house and I'm afraid my nerves can't take it."
On September 11, 1980, Mrs. Vick wrote Lois telling her that Conner had come by that morning and told her that "the Vick Bros. (4) have turned the whole mess over to you." She also wrote that Willola called her many times a day and yelled at her. She would hang up, and Willola would call again. Further in this letter she wrote as to Willola:
She's pressing me to see Cliff and sign some papers. I can't find out what it is I must sign. She wants to move in down here. How could I put up with her yelling, etc.  but I may  I think it unwise for her to leave her husband in Memphis.
And still further:
She wants to get down here and fight with Conner  that I don't want. She would have to depend on him for his pick-up  machinery of all kinds to do what she plans to do  and that is quite a bit  she is a troublemaker. I want peace from here on out.
In her letters Mrs. Vick wrote that she would tell Willola that she was sweet and she loved her, and that pacified her.
On September 12, 1980, in a letter to all the other children, Lois wrote acknowledging the receipt of letters from Montie and Sam, Jr., and their desire to make arrangements to help their parents. She also wrote them of Mrs. Vick's telling her that Willola wanted to move in with Mr. and Mrs. Vick, and that Willola was coming with Cliff Finch to get her to sign some papers, but Mrs. Vick did not know what they wanted her to sign. Lois wrote that Mrs. Vick wanted things to settle down before a meeting in which she, Mrs. Vick, would be present, and that while her parents were doing all right, they did need relief. She did not think Mrs. Vick felt up to a meeting with her children herself, but perhaps the children could do something by getting together. Lois suggested a meeting among the children in Batesville on September 27 at a room in some restaurant. She suggested they discuss a trust for their parents, how to finance the cost of relief without dipping into their parents' savings, and finding some good help.
On September 17 Willola responded with a seven-page typed letter to all the children expressing outrage at the accusation that she wanted to move in with her parents, and that she was taking Cliff Finch to get Mrs. Vick to sign papers. She wrote that Mr. Finch would see Mrs. Vick alone, and only at Mrs. Vick's request. The letter accused Lois of trying to influence Mrs. Vick, and stated that there had been a will written by Mr. Vick which was missing. She complained of having been excluded from a Jackson meeting among the children. When, and who was present at such a meeting is not disclosed, although the boys apparently met somewhere. Willola wrote of the things she had done for her parents, making repairs in the house, and getting them to medical specialists in Memphis. She also wrote that Mrs. Vick should be permitted to discuss with an attorney alone her wishes. She complained that Mr. *763 Vick's papers had been taken from his vault.
A meeting was held among the children on October 11, at a Sardis motel, at which time Conner, when told that Willola believed Mr. Vick had written a will leaving his property to his sons, responded that Mr. Vick had told him his will was a "share and share alike will." Apparently nothing fruitful was agreed upon among the children at this meeting.
On October 15 Mrs. Vick wrote Mr. Finch requesting that he represent her and for him to get all papers relating to Mr. Vick's property "such as deeds and wills."
On November 3 Mr. Finch addressed a common letter to all the children except Conner, informing them that Mrs. Vick had employed his firm. He told them Mrs. Vick loved them all, and had been hesitant, but she now wanted to bring everything out in the open so that she would know what was going on in reference to the property Mr. and Mrs. Vick had accumulated.
The letter continued that he wanted records pertaining to wills, testamentary writings, as well as any other information concerning this couple's property. He expressed a desire to bring everything out in the open so that everybody would know what was going on and that no one was trying to do anything except bring them all together, so that everyone would be treated equally. He warned that unless the children cooperated, he could take the matter to court, but which he hoped to avoid. He asked to hear from them within ten days, and to send him copies of wills, deeds, and such information.
Such proposed meeting by Mr. Finch did not transpire. Instead, on February 9, 1981, Conner, joined by Montie and Sam, Jr., filed a petition in the chancery court for Conner to be appointed conservator of Mr. Vick. Neither the girls nor Mrs. Vick were notified of this petition. Mr. Vick apparently signed a waiver or joinder. When Mrs. Vick and Jane and Willola learned of this, the girls, represented by Dwight Ball of Oxford, and Mrs. Vick, represented by Mr. Finch, filed a petition to remove Conner as conservator, and revoke his letters of conservatorship. An amended petition to remove, filed June 18, alleged that Mr. Vick had a severe hearing loss, was totally blind, totally disabled, and unable to comprehend or understand what he had signed.
After the removal petition was filed, Conner typed a letter, "Dear Mother and Dad," but directed mainly to Mrs. Vick. He wrote that he was relinquishing the conservatorship and was terminating the close relationship between himself and his parents which had existed over the years. He said he would keep the farm the 1981 year and pay rent. He told Mrs. Vick he knew both she and Mr. Vick desperately needed him, and recounted close calls and injuries which they, because of their physical disabilities and age, had encountered. He wrote he could no longer give Mrs. Vick her insulin shots.
A local nurse showed Mrs. Vick how to give insulin shots to herself, and thereafter Mrs. Vick gave herself the shots.
The conservatorship was set aside by the chancery court, apparently because of failure to give Mr. Vick statutory notice.
While the controversy over Mr. Vick's conservatorship was stirring, Mrs. Vick became active herself. On May 1, 1981, Mr. Vick executed a warranty deed, prepared by Mr. Finch, conveying an undivided one-half interest in his realty unto Mrs. Vick. On June 24 Mrs. Vick wrote a two-page letter to Mr. Finch to prepare the necessary papers as soon as possible, and telling him that if she became incapacitated she wanted her three daughters to make decisions for her. She wrote that in regard to her medical problems, under no circumstances "are my legs to be amputated  no tubes in my nose and no surgery of any kind." She wrote where she wanted to be buried, the name of the officiating preacher, and for an appropriate fence to be erected around her burial site. She did not want an expensive funeral, no flowers, only a family wreath.
As to her will, she concluded with what in effect was a holographic will leaving all her worldly possession to Mrs. Lois Ann *764 Wallace, Mrs. Jane Nicholas and Mrs. Willola Sullivant. If necessary for her burial expenses, she directed that her wedding ring and engagement ring be sold at fair market value to cover the cost. If not necessary, then "I hereby will my rings to my granddaughter, Lois Ellen Nicholas."
For some unaccountable reason, Mrs. Vick's will as prepared by Mr. Finch was not executed until April 5, 1982. It was no doubt prepared by Mr. Finch in 1981, because the year typed on the instrument is "1981." On April 5, 1982, Mr. Finch, accompanied by a secretary, also a notary public from his office, Mrs. Martha M. Still, went to Mr. and Mrs. Vick's home, where Mr. Vick executed a correction warranty deed to an undivided one-half interest in his realty unto Mrs. Vick, and Mrs. Vick executed her will, which had been drafted quite accurately according to the instructions of her June 24, 1981, letter to Mr. Finch. The will bequeathed her rings to Lois Ellen, her granddaughter, and devised all the remainder of her estate unto the three girls Willola Vick Sullivant, Jane Vick Nicholas, and Lois Ann Vick Wallace. The will was witnessed by Mr. Finch and Mrs. Still. Previous to this occasion, Mrs. Still had talked two or three times over the telephone to Mrs. Vick.
Jane learned that Sam, Jr., had gone to Mrs. Vick upset because she had wanted Conner removed as conservator. On August 3, 1981, she wrote the three boys an angry two-page, single-spaced letter about how they had acted regarding the girls and Mrs. Vick, and warning them not to harass Mrs. Vick and stop "hovering around like buzzards."
Mrs. Vick departed this life January 5, 1986. On January 6 an objection was filed objecting to any probate of her will, and also requesting a hearing as to her burial site. Conner, Sam, Jr., Montie and Lois filed this objection. Later that same day the will executed by Mrs. Vick on April 5, 1982, was filed for probate. In the meantime, Mr. Finch himself had died.
One of the chancellors of the district, Honorable Dennis M. Baker, had done legal work for Mr. Vick, and Honorable Leon E. Hannaford recused himself. Honorable Harvey T. Ross of Clarksdale served as special chancellor.
The will was contested upon two grounds, lack of testamentary capacity, and that it was procured through the undue influence of Willola.
A jury trial on the issue of devisavit vel non began January 1, 1987. At trial Mrs. Still testified that she had never personally met Mrs. Vick prior to going to her home on April 5, 1982, except to talk to her on the telephone. She related a conversation Mr. and Mrs. Vick had with them that day at the Vick residence prior to Mr. Vick executing the deed. Then, she testified, Mrs. Vick walked into another room with her and Mr. Finch where Mr. Finch read from the proposed will, with Mrs. Vick also reading.[1]
She recalled Mrs. Vick giving as her reason for devising all her property to the girls that Mr. Vick was willing all his interest in the property to the boys. According to her, Mrs. Vick told Mr. Finch, "You know, he's leaving his to the boys. I want mine for the girls." She further recalled Mrs. Vick stating about Mr. Vick, "He says that's the way it should be because the boys are the ones that help us all the time, but the girls are just so far away, they can't." (II. 269) It was quite clear to Mrs. Still that Mrs. Vick's motivation for devising her property to the girls was that Mr. Vick was devising his interest to the boys. As to Mrs. Vick's reaction to Mr. Vick's leaving his property to the boys, "She acted like she didn't think that was right." (II. 283)
There was no strong testimony that Mrs. Vick lacked the testamentary capacity to execute the will. There was testimony about her susceptibility to influence from whomever was around her at the moment. This, however, was also strongly disputed. Every one of the boys testified she had a strong will of her own.
Willola testified that she was not present when Mrs. Vick consulted with Mr. Finch, *765 had nothing to do with hiring him, or preparing or executing the will, and was never present at any conference or consultation with Mr. Finch. Although Willola at the time was on a joint checking account with Mrs. Vick, the bank statements show that Mrs. Vick wrote and signed all checks from the account, including payment to Mr. Finch for his legal services. There was no proof offered that Willola in fact did know anything about Mrs. Vick's will prior to its execution, or engaged in any manner in its execution. Instead, the record shows clearly that Mr. Finch was retained following a letter to him from Mrs. Vick, and that the will he prepared was strictly in accordance with a handwritten letter she wrote him.
Mr. Vick died within a matter of months of Mrs. Vick. His will was offered into evidence at the trial. Under Mr. Vick's will, dated September 23, 1975, and witnessed by Jackie Hudson and Dennis M. Baker, he devised a life estate in his realty unto Mrs. Vick and, subject only to this life estate, devised all of his real property "to my children, share and share alike." He did provide, however, that the portion of his real estate devised to Jane Vick Nicholas be obligated to the extent he had spent on the education of her daughter Lois Ellen Nicholas.
Other than the suspicions and opinions of Mrs. Vick and her daughters, there is no evidence that Mr. Vick ever executed, or attempted to execute a will subsequent to his 1975 will which was offered for probate.
By instruction the jury was authorized to return into court a verdict that Mrs. Vick's will was valid, that it was invalid for lack of testamentary incapacity, or that it was invalid because of undue influence. The jury returned a verdict declaring the will was invalid because of undue influence.
Jane has appealed.

LAW

JURY ISSUE ON UNDUE INFLUENCE
It is cogently argued that no jury issue at all was made on undue influence, but even viewed in the best possible light for the contestants, at the least the verdict was against the overwhelming weight of the evidence. It is pointed out that Mrs. Vick on her own wrote a handwritten will on June 24, 1981, reflecting full comprehension of her wishes, that Mr. Finch was her attorney and no one else's, and that on April 5, 1982, she clearly reaffirmed her wishes by executing the will. Later, Mr. Finch sent her a statement for legal services rendered, and on June 18, 1982, she paid him by a check entirely in her own handwriting. On August 3, 1984, she wrote Mr. Finch to send her a copy of her will, which he did, and it is argued she re-adopted the will by not requesting any further changes. She never in any way expressed to her attorney a desire to change her will.
It is further pointed out that Conner was the only person she could have depended on for immediate personal needs, Willola being 70 miles away in Memphis, and Jane several hundred miles away in Texas. There was no proof of Willola having anything to do with employing Mr. Finch when the will was written, consulting with him, or paying him for legal services. To the contrary, all the evidence clearly shows Mr. Finch considered himself the exclusive attorney for Mrs. Vick, and obligated to look after her interest alone, which he manifestly did quite well.
We are reminded of the most solemn obligation any court can have: to see that the true intent of the testator is carried out. Costello v. Hall, 506 So.2d 293 (Miss. 1987), and further that it is not the court's function to decide whether a will was in fact "unfair" or "unjust," Matter of Last Will of Dickey, 542 So.2d 903 (Miss. 1989), this being for the sole determination of the testator. Indeed, there is no Constitutional right more jealously safeguarded than the absolute freedom of a testator to dispose of his own property as he chooses. This is his business, and his business alone. These are well known and accepted principles of law.
While we fully agree with counsel's argument, there is another facet, ignored by counsel. Mrs. Vick was convinced that her husband was leaving all his property consisting *766 of 750 acres, and solely in his name, to the boys. This motivated her to get from him a warranty deed to her of an undivided one-half interest in his property. In all likelihood, in Mr. Vick's physical and mental condition at the time, she could have secured a deed from him of his entire interest. She did not do this, however, but only a deed to an undivided one-half interest. The purpose of this was to see that, while Mr. Vick might himself wish to will all his property to his sons, the total interest they received would not exceed an undivided one-half interest. She thus preserved an undivided one-half interest for their three daughters.
She clearly showed two things on her mind: she had no desire to deprive the sons of an undivided one-half interest, and also, the most she wanted for the girls was an undivided one-half interest. Mrs. Vick's intent, as so clearly testified by Mrs. Still, the proponents' own witness, was to see that all the children were treated equally. It was only because she thought Mr. Vick was willing all his property to the sons that she was herself leaving the entire one-half interest deeded to her to the daughters.
This was for the jury to hear and take into due account.
But, ah, Mrs. Vick was mistaken! We will never know whether the conviction she had as to Mr. Vick's planned disposition of his property was a well-founded or unfounded suspicion. The failure of the children to cooperate with Mr. Finch, and the sons' placing Mr. Vick under a conservatorship without saying anything to her certainly added to her fears. The point, however, is that she believed it, acted upon it, and was mistaken as events developed.
This, too, the jury heard and could take into account.
Nor, could it have escaped the jury's attention that had Mrs. Vick been completely satisfied in her own mind that Mr. Vick's will was treating all the children equally, and that there would not be any deviation from this, she probably would have had no desire to write a will as she did. The jury could have, and may very well have concluded that the will Mrs. Vick wrote, and the will she executed, in fact accomplished a result she did not intend, and would never have written had she known events would develop as they did. Indeed, the jury could have concluded that only by setting aside Mrs. Vick's will could her genuine desire be accomplished.
A mistaken belief of an extrinsic fact, even though it causes a testator to make a will differently than he otherwise would had he known the truth is insufficient to avoid a will. As was stated by the New Jersey court in Re Gluckman's Will, 87 N.J. Eq. 638, 101 A. 295 (1917):
It is more important that the probate of the wills of deceased persons be effectively shielded from the attacks of a multitude of fictitious mistakes than that it be purged of wills containing a few real mistakes. The latter a testator may by due care avoid in his lifetime. Against the former he would be helpless.
In this case, however, there was ample evidence from which the jury could have concluded that Willola, whether she in fact did or did not, significantly contributed by her statements and conduct to Mrs. Vick's reaching the conclusion that Mr. Vick was favoring the boys. Mrs. Vick may in fact have reached this conclusion on her own, unassisted by either Willola or Jane. Fraud and undue influence can only be proved by circumstantial evidence, however, and there was sufficient evidence in this record for the jury to conclude that Willola played a material role in implanting this firm conviction in Mrs. Vick's mind. Woodville v. Pizzati, 119 Miss. 442, 81 So. 127 (1919); Jamison v. Jamison, 96 Miss. 288, 51 So. 130 (1910).
The question arising, therefore, is this: If the jury believed, as they very well may have believed from the evidence, that Willola played a material part in implanting in Mrs. Vick's mind the mistaken belief that Mr. Vick was excluding his daughters and leaving all of his property to his sons, is this ground for setting aside the will? This, of course, is not simply undue influence practiced by a strong and overpowering person on a weak person, but undue *767 influence by deception as well. Should the girls be permitted to benefit from a misrepresentation which caused Mrs. Vick to execute this will? This is the first time this question has been before this Court.
We cannot in this case unravel the secrets behind the bond between parent and child, child and parent, husband and wife. It is beyond cavil that one member of a family can very well be peculiarly vulnerable to entreaties, blandishments, threats from another member. A person to someone outside the family may be as fixed as the Rock of Gibraltar, but the solidity melts at the approach of another member of the family. There is generally a subtle recognition by one family member of what tune to play to get another member of the family to dance. Jamison v. Jamison, supra.
In this case there was direct evidence of persistent efforts by Willola to get Mrs. Vick to secure for her some interest in the Vicks' property. There was also direct and circumstantial evidence from which the jury could conclude she used undue influence by constantly badgering Mrs. Vick when she was well advanced in years and in failing health. Likewise, there was, as noted, sufficient evidence for the jury to conclude that Willola played a material part in convincing Mrs. Vick that Mr. Vick had devised all his real property to their sons. Thus, there was evidence of undue influence exercised through a coupling of threats and entreaties with misrepresentation.
In the treatise, 1 Bowe-Parker: Page on Wills, § 14.3, 694 (rev. 1960), there is a distinction made between fraud and undue influence:
Though the similarity between fraud and undue influence has often been pointed out, there is a very clear cut difference between the two concepts. Undue influence consists in exerting sufficient pressure or influence upon the testator to break down his will power and overcome his free agency or free will so that he is unable to keep from doing that which he would not otherwise do. Such undue influence need not involve the use of false and fraudulent need not involve the use of false and fraudulent representations or untrue statements. Unrelenting importunity that employs the use of perfectly true and accurate information may become so overbearing as to constitute undue influence, though such could not by any means constitute fraud.
Fraud on the other hand need not involve the overpowering of the testator's free agency or will power, though it is by no means impossible that false statements may be so used to harass the testator to the point that he is both tricked and deprived of his will power. The basic ingredient of fraud however is that the testator is deceived through the use of false information, so that his free will or free agency, of which he is not deprived, is exercised upon the basis of false information.
While the above observations are quite accurate, it is likewise true that one of the many ways of effecting undue influence upon a testator is by misrepresentation of fact. The misrepresentation may be made with the deliberate intent to deceive, knowing full well that it is false, as well as recklessly made without regard to its truth or falsity.
In order to set aside a will resulting solely from the misrepresentation of a beneficiary, it must first, of course, be established that the representation was not true and actually influenced the testator to make a will he would not otherwise have made, that but for the misrepresentation by the beneficiary, the will would have been entirely different. 79 Am.Jur.2d, § 410; McCartney v. Holmquist, 70 App. D.C. 334, 106 F.2d 855, 126 A.L.R. 375 (1939); Re Shell's Estate, 28 Colo. 167, 63 P. 413 (1900); Terry v. Buffington, 11 Ga. 337 (1852); Ginter v. Ginter, 79 Kan. 721, 101 P. 634 (1909); Davis v. Calvert, 5 Gill & J. 269 (Md. 1833); Gockel v. Gockel, 66 S.W.2d 867 (Mo. 1933), 92 A.L.R. 784; Re Gluckman's Will, 87 N.J. Eq. 638, 101 A. 295 (1917). Also, 94 C.J.S. Wills, § 222, note 75. In re Pohlmann's Estate, 89 Cal. App.2d 563, 201 P.2d 446 (1949); Duckett *768 v. Duckett, 134 F.2d 527, 77 U.S.App. D.C. 303 (1943); In re Hollis' Estate, 234 Iowa 761, 12 N.W.2d 576 (1944); Leonard v. Stanton, 93 N.H. 113, 36 A.2d 271 (1944); Corpus Juris cited in In re Beneway's Will, 272 App.Div. 463, 71 N.Y.S.2d 361, 366 (1947); Morin v. Morin, 332 Mass. 223, 124 N.E.2d 251 (1955); O'Brien v. Collins, 315 Mass. 429, 53 N.E.2d 222 (1944); Mirick v. Phelps, 297 Mass. 250, 8 N.E.2d 749 (1937); Neill v. Brackett, 234 Mass. 367, 126 N.E. 93 (1920); In re Dand's Estate, 41 Wash.2d 158, 247 P.2d 1016 (1952); In re Bottger's Estate, 14 Wash.2d 676, 129 P.2d 518 (1942); Matter of Robinson's Estate, 231 Kan. 300, 644 P.2d 420 (1982); In re Spillette's Estate, 352 Mich. 12, 88 N.W.2d 300 (1958); In re Miller's Estate, 206 Or. 358, 292 P.2d 504 (1956); Matter of Weickum's Estate, 317 N.W.2d 142 (S.D. 1982); In re Ford's Estate, 19 Wis.2d 436, 120 N.W.2d 647 (1963); 68 C.J.S., p. 741, n. 2.
In decisions from other jurisdictions, it has also generally been held that in order to invalidate a will resulting from a misrepresentation of an extrinsic fact, it must be shown that the beneficiary actually knew the representation to be false, and intended to deceive. 94 C.J.S., Wills, § 222, p. 1063; In re Newhall's Estate, 190 Cal. 709, 214 P. 231, 28 A.L.R. 778 (1923); 79 A.Jur.2d Wills, § 411, p. 656, n. 56, 57; Gockel v. Gockel, supra; 66 S.W.2d 867, 92 A.L.R. 784, In re Whitmarsh's Estate, 133 Misc. 858, 234 N.Y.S. 505 (1929).
Page on Wills, supra, has some objection to this rule, § 14.1, pp. 690-691:
There are a number of arguments one may use to question the desirability of the rule that a gift or an entire will induced by an innocent misrepresentation will be allowed to stand and that the heir or other disappointed person who would have taken but for the misrepresentation will be given no relief. While innocent misrepresentation occupies a place midway between mistake and fraud, its consequences, as far as they concern the validity of the instrument induced thereby, ought to be those of fraud rather than of mistake. Apart from the difficulty of showing a knowledge of falsity at the time that the misrepresentations are made, one who has obtained unfair advantage by a falsehood ought not to be permitted to retain it, even if he was acting in good faith when he made such statement.
Page agrees that while a mistake as to an extrinsic fact made by the testator on his own affords no ground for setting aside a will, the situation is different when the mistake is caused by a misrepresentation made to him by a beneficiary, § 14.1, p. 691:
It should be pointed out that while mistake in the inducement, for which relief is denied and the will is upheld as it is, is completely subjective and wholly within the testator's own mind, innocent misrepresentation has certain objective manifestations similar to those of fraud and undue influence in that the cause of the testator's mistaken frame of mind is caused by the conduct of a third person. Thus, for the court to inquire into the existence of innocent misrepresentation is not quite as hazardous as to inquire into mistake, for there would be some difference in the evidence available and less likelihood that the court would reach an improper conclusion on the facts. To prove an innocent misrepresentation should be no more difficult than to prove a fraudulent one... .
And, in the California Supreme Court in the case of In re Arnold's Estate, 147 Cal. 583, 82 P. 252, 254 (1905), held that a misrepresentation made in "bad faith" could invalidate a will, even though the beneficiary believed the statement true:
If he was acting in bad faith for the purpose of procuring the execution of the new will, the fact that he actually believed to be true some of the false representations by which he obtained the undue influence required would not make the transaction an innocent one, nor render a will so procured valid.
The record reveals that in the Vick children fear, and its twin offspring greed and envy, ran rampant. We hold that there was no requirement under the facts of this case for the proof to show that *769 Willola or Jane in fact knew the statement that Mr. Vick had devised all of his property to his sons was in fact false. There was sufficient evidence for the jury to conclude it was made in reckless disregard of its truth or falsity, and no more should be required. Moreover, such statements could hardly be classified "innocent misrepresentations" made in "good faith." Finally, neither Willola nor Jane could complain in the jury securing for them precisely that for which they contended all along during their parents' lives, an equal division of the property between all the children.
We therefore conclude that under the facts of this case there was sufficient evidence of undue influence exercised upon Mrs. Vick, in the absence of which she would not have executed the will she made.

CONFIDENTIAL RELATION INSTRUCTION
The appellant assigns as error the giving of the following instruction:
INSTRUCTION NO. 4-C
If you believe from a preponderance of the evidence that there was a relationship between Willola Sullivant and Lois M. Vick in which Willola Sullivant was in a position to exercise a dominant influence upon Lois M. Vick because of Lois M. Vick's dependency upon Willola Sullivant, arising either from a weakness of mind or body, or trust, then the law presumes that Willola Sullivant exerted undue influence over Lois M. Vick in the signing of the Will of Lois M. Vick and the Will, therefore, is invalid and of no effect unless the proponent of the Will, Willola Sullivant, overcomes this presumption of undue influence by clear and convincing evidence of:
(1) Good faith on the part of Willola Sullivant;
(2) Lois M. Vick's full knowledge and deliberation of her actions and their consequences, and
(3) Advice of competent persons, disconnected from Willola Sullivant and devoted wholly to Lois M. Vick's interest.
We note in the record that the chancellor refused this instruction initially. Apparently he changed his mind and granted it, and did not consider he had erred in doing so, because this was one of the errors assigned in a motion for a new trial, which he denied.
Giving this instruction was error, but harmless, for the reasons given below.
In the first place it is doubtful that Mrs. Vick had that dependency upon Willola necessary to create a confidential relationship in fact. Willola lived seventy miles away. The dependency in this case was not singled on any one child. In re Will and Estate of Varvaris, 477 So.2d 273 (Miss. 1986); Costello v. Hall, supra.
In the second place, there is no proof that Willola was in any way active in the preparation of execution of this will. Matter of Will of Adams, 529 So.2d 611, 615 (1988); Croft v. Alder, 237 Miss. 713, 115 So.2d 683, 686 (1959). From this record it appears Mrs. Vick consulted Mr. Finch on her own, and Willola had nothing to do with either the preparation or execution of the will.
Finally, if such a presumption of undue influence had been created, it was clearly dissipated by the uncontradicted evidence that Mrs. Vick consulted Mr. Finch on her own, and he never attempted to represent any other person than Mrs. Vick. Thus, the proponents met the burden of showing completely independent advice, devoted solely to the testatrix's own interest. Croft v. Alder, supra, 237 Miss. at 725-726, 115 So.2d at 687; Ham v. Ham, 146 Miss. 161, 174, 110 So. 583, 585 (1926). Also, Lowery v. Will of Smith, 543 So.2d 1155 (Miss. 1988); In re Estate of Harris, 539 So.2d 1040 (Miss. 1989); Blissard v. White, 515 So.2d 1196 (Miss. 1987); Olmstead v. Olmstead, 233 Miss. 621, 103 So.2d 399 (Miss. 1958).
Finally, the presumption of undue influence arising from a confidential relation's transaction is a presumption of law. Harris v. Bradley, 539 So.2d 1040, 1041-1042 (Miss. 1989); Miner v. Bertasi, 530 So.2d 168, 170 (Miss. 1988); Matter of Will of Adams, 529 So.2d 611, 614-615 (Miss. *770 1988); Estate of McRae, 522 So.2d 731, 737 (Miss. 1988); Angle v. Estate of Angle, 519 So.2d 883, 884-885 (Miss. 1988); Costello v. Hall, 506 So.2d 293, 297 (Miss. 1987); Murray v. Laird, 446 So.2d 575, 578 (Miss. 1984); Hendricks v. James, 421 So.2d 1031, 1041 (Miss. 1982); Wofford v. Wofford, 244 Miss. 442, 456, 142 So.2d 188, 195 (1962); Croft v. Alder, 237 Miss. 713, 715, 115 So.2d 683, 686 (1959); Hickey v. Anderson, 210 Miss. 455, 462, 49 So.2d 713, 717 (1951); Ham v. Ham, 146 Miss. 161, 173, 110 So. 583, 584 (1926); Hitt v. Terry, 92 Miss. 671, 697, 707, 710-712, 46 So. 829 (1908); Meek v. Perry, 36 Miss. 190, 243, 244, 252, 259 (1858).
And, ordinarily, it is for the trial court, not the jury, to decide whether the evidence adduced creates a presumption. Moore v. State, 205 Miss. 151, 163, 38 So.2d 693, 695 (1949); Louisville & N.R. Co. v. Cuevas, 162 Miss. 521, 525, 139 So. 397, 399 (1932); N.O. & G.N.R. Co. v. Walden, 160 Miss. 102, 112, 133 So. 241, 245-246 (1931); Walker v. State, 146 Miss. 510, 515, 112 So. 673, 677 (1927); see generally, In re Estate of Swantek, 172 Mich. App. 509, 432 N.W.2d 307 (1988); Estate of Berry, 170 Ill. App.3d 454, 120 Ill.Dec. 659, 524 N.E.2d 689 (1988); Estate of Mann, 184 Cal. App.3d 593, 229 Cal. Rptr. 225 (1986); Franciscan Sisters Health Care Corp. v. Dean, 95 Ill.2d 452, 69 Ill.Dec. 960, 448 N.E.2d 872 (1981); Diederich v. Walters, 65 Ill.2d 95, 2 Ill.Dec. 685, 357 N.E.2d 1128 (1976).
This is to not say, however, that the presumption of undue influence arising from a confidential relationship may not be a jury question as well. If the facts are in dispute, there is a two-pronged inquiry: has there been sufficient evidence adduced to create the presumption, and if so, has there been sufficient evidence adduced to dissipate it.
When chancellors are confronted with this problem in future cases, they might consider submitting the issue to the jury by interrogatories, the first to determine whether the presumption arises, and if so, the second as to whether the evidence has dissipated it.[2]
While the giving of Instruction 4-C was erroneous in our view, we are convinced it was harmless error under the unusual facts of this case. The appellant makes no contention but that the jury was otherwise properly instructed on the law of undue influence generally. Under the proof in this case, Mrs. Vick's only reason for executing the will she made was her conviction that Mr. Vick was devising all his property to the sons. This, coupled with her desire (as expressed through her attorney Mr. Finch, and by herself by implication) to treat all the children equally, was the compelling reason the jury set aside the will. Had they upheld the will, it would have frustrated Mrs. Vick's own wishes. It would be extremely difficult to envision a jury reaching any other conclusion than they reached in this case.
We find no merit in the remaining assignment of error.
For the reasons stated, the decree of the chancery court invalidating and setting aside the will will be affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
NOTES
[1] Mrs. Still was undoubtedly mistaken as to Mrs. Vick walking.
[2] The jury is given the following interrogatories:

(1) Do you find from a preponderance of the evidence (set forth facts required to prove confidential relationship and presumption of undue influence)?
YES ____
NO ____
If your answer to the first question is "No," stop there. If your answer is "Yes," go on to the next interrogatory.
(2) Do you find from a preponderance of the evidence that (set forth facts which would dissipate the presumption)?
YES ____
NO ____