# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-CA-01176-SCT

*IN THE MATTER OF THE ELTON G. BEEBE, SR.*
*IRREVOCABLE FAMILY MORTGAGE TRUST*
*DATED AUGUST 14TH, 1992, AS AMENDED:*
*GLADYS COLE BEEBE, GAIL SMITH, LANCE*
*SMITH, BRIELLE SMITH, CANDACE LEAK,*
*COLE LEAK, AND CYDNEY LEAK*

*v.*

*FAMILY MANAGEMENT, INC., TRUSTEE*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/01/2022 |
| TRIAL JUDGE: | HON. CYNTHIA L. BREWER |
| TRIAL COURT ATTORNEYS: | SHELDON G. ALSTON |
| | MARGARET KATHRYN DUFF |
| | KENNETH HARMON |
| | JAMES WILLIAMS JANOUSH |
| | JOHN BRENNAN DONGIEUX |
| | HARRIS H. BARNES, III |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | SHELDON G. ALSTON |
| | JACOB ARTHUR BRADLEY |
| | MARGARET KATHRYN DUFF |
| ATTORNEYS FOR APPELLEE: | JAMES WILLIAMS JANOUSH |
| | HARRIS H. BARNES, III |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 02/29/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     More than twenty-five years after the creation of an irrevocable trust, a trustee of the

trust filed a petition to correct an alleged scrivener's error that failed to convey the settlor's

intent relating to a remainder distribution clause. The trial court found that the petitioner had proved by clear and convincing evidence the settlor's intent at the time he created the trust and reformed the remainder distribution clause to conform to the settlor's intent. Because the trial court did not abuse its discretion by granting the petition for reformation, we affirm the decision of the trial court.

## FACTS AND PROCEDURAL HISTORY

¶2. On August 14, 1992, Elton G. Beebe, Sr. (Elton), as settlor, along with five trustees, created the Elton G. Beebe Irrevocable Family Mortgage Trust (the Trust). Article I, Section 1.1, of the Trust provided that "[t]his Trust instrument is hereby expressly made irrevocable, and it shall not at any time or by any person or persons be capable of amendment, modification, or alteration in any manner." Two initial trustees, Earl Keyes, the attorney responsible for drafting the Trust, and William Paul, are now deceased.[1] Elton Glynn Beebe, Jr. (Glynn), Hibernia Dyess Williams, and Susan K. Ward also were named as initial trustees.[2] At the time of trial, the Trust's assets totaled approximately $80 million.[3]

¶3. The Trust named the following sixteen individuals as lifetime beneficiaries:

    1.    **Emma Rosella Beebe** - Elton's mother (now deceased)

    2.    **Carol Woods Beebe** - Elton's spouse

---

[1]William was Elton's company's certified public accountant (CPA).

[2]Hibernia was Elton's executive assistant. Susan was Earl's daughter.

[3]At the time of trial, the Trust contained thirteen nursing home facilities (not operational nursing homes but the real estate that the nursing homes occupy), a 30 percent ownership of an insurance company, and a hunting club.

3. **Judy Pleasant Cyphert** - Elton's ex-wife (now deceased)

4. **Felicia Charmain Beebe Stallard** - Elton's biological daughter

5. **David Whitney Stallard, II** - Felicia's husband

6. **Glynn** - Elton's biological son

7. **Alison Claire Beebe** - Elton's biological daughter

8. **Harold Lance Beebe, Sr.** - Elton's brother (now deceased)

9. **Gladys Cole Beebe** - Harold's wife

10. **Herman Kendrith Beebe, Sr.** - Elton's brother (now deceased)

11. **Shirley Seawright Cooper** - Herman's wife (without lineal descendants)

12. **Mary Womack Webb** - Herman's ex-wife (now deceased)

13. **Bobbie Lester Beebe** - Elton's brother

14. **Jeanne Boudreaux Beebe** - Bobbie's wife

15. **J.B. Summit** - Carol's uncle (now deceased and without lineal descendants)

16. **Jo Juanna Summit** - Carol's aunt (now deceased and without lineal descendants)

The Trust provides that it is a discretionary trust and that the trustees, in their sole discretion, are authorized to distribute the net income and principal of the Trust to the named beneficiaries "for their support, welfare, and maintenance . . . ." The Trust further provides that "[a]ny income not distributed shall be accumulated."

¶4.    The provision at issue, Article III, Section 3.2, governs the termination of the Trust and states that

Unless all of the principal of this Trust is previously distributed, this Trust shall terminate upon the death of the last of the named beneficiaries to die; at such time, any remaining principal and accumulated income of the Trust shall be distributed in equal shares to the descendants of the named beneficiaries, or their issue, <u>per stirpes</u>.

It is undisputed that Section 3.2 is unambiguous.

¶5.    On November 13, 2020, Family Management, Inc. (FMI), as current trustee of the Trust, filed in the Chancery Court of Madison County a petition to modify and/or reform the Trust under Mississippi Code Sections 91-8-410 and -415 (Rev. 2021).[4] Mississippi Code Section 91-8-415 provides:

The court may reform the terms of a trust, even if unambiguous, to conform the terms to the settlor's intention if it is proved by clear and convincing evidence what the settlor's intention was and that the terms of the trust were affected by a mistake of fact or law, whether in expression or inducement.

Miss. Code Ann. § 91-8-415 (Rev. 2021). The petition stated that Elton had "recently undertaken a review of his assets, estate, businesses, and existing trust(s) based on his age and desire to become less involved with the day to day operations of his various business ventures, which are vast." Upon review, Elton discovered that Article III, Section 3.2, of the Trust did not accurately reflect his intent. Instead, the petition stated that Elton had intended that, upon the death of the last of the named beneficiaries, the Trust's assets would be distributed to Elton's lineal descendants, *per stirpes*, as opposed to the lineal descendants of all sixteen initial beneficiaries. FMI requested that the trial court modify Article III, Section

---

[4]FMI, an LLC, was created in 2014 to be a perpetual trustee for the Trust. Glynn is the head of FMI. Four Generations Holdings, LLC, a holding company, was also created in 2014, and the thirteen properties are held in the corporation. Four Generations is 100 percent owned by the Trust.

3.2, to reflect Elton's true intent.

¶6. Attached to the petition was Elton's affidavit, which stated that the Trust contained a scrivener's error and did not accurately reflect his wishes and intentions that he had conveyed to Earl. Elton stated that "[i]t was always my intention and wish that the Trust provide a lifetime benefit *only* to the sixteen (16) named individuals; then, once all said individuals are deceased, the Trust would be administered for the benefit of *my* lineal descendants." Elton wrote:

> 11. Further, as written, administration of the Trust would be [sic] become impractical, obnoxious, or unworkable due to likelihood of a vast number of beneficiaries; after all, the youngest named lifetime beneficiary, Alison Claire Beebe, is currently fifty (50) years old and, per actuarial tables of the Social Security Administration, is expected to live another thirty-three (33) years.
>
> . . . .
>
> 13. For instance, one (1) named individual lifetime beneficiary, Herman Kendrith Beebe, Sr., died in 2015, leaving four (4) children of his own. Said four (4) children range in age from approximately sixty-three (63) years old to seventy (70) years old, all of which have two (2) children of their own.
>
> 14. As such, the number of beneficiaries at the time of termination of the Trust, as written, could be exponential, resulting in an exponential number of owners of property currently held in the Trust, which would make management of said property very tedious.

¶7. FMI named seventy-four respondents in the petition, including twenty-two minors. The trial court then added an additional minor as the seventy-fifth respondent. Forty-eight of the fifty-two adult respondents joined the petition. Gladys Beebe, Gail Smith, Lance Smith, Brielle Smith, Candace Leak, Cole Leak, and Cydney Leak (the Respondents) did not

execute joinders and filed an answer and affirmative defenses.[5]

¶8. At FMI's request, the trial court appointed a guardian *ad litem* to represent all minor children in the action. Subsequently, the order was amended to appoint a guardian *ad litem* only on behalf of Elton's nonlineal descendants. John Dongieux was appointed as guardian *ad litem* for the nonlineal descendant minors. The parents of Elton's lineal descendants joined in the action on behalf of their minor children under Mississippi Code Section 91-8-303 (Rev. 2021).

¶9. The trial court set the case for a bench trial on June 6-7, 2022. Seven witnesses testified at trial, and the deposition transcripts of Hibernia and Gladys were admitted into evidence.

¶10. On November 1, 2022, the trial court found that FMI had proved Elton's original intent and mistake of fact by clear and convincing evidence and granted the requested reformation of the Trust to conform to Elton's intent. The trial court reformed Article III, Section 3.2, of the Trust to state:

> Unless all of the principal of this Trust is previously distributed, this Trust shall terminate upon the death of the last of the named beneficiaries to die; at such time, any remaining principal and accumulated income of the Trust shall be distributed in equal shares to the lineal descendants of the Settlor, Elton G. Beebe, Sr., *per stirpes*.

The Respondents appealed to this Court and raised the following issues, verbatim:

I. The Chancery Court committed legal errors that this Court should review *de novo*.

---

[5]Gladys is one of the named beneficiaries and is Elton's sister-in-law. Gail is Gladys's daughter. Lance is Gail's son, and Brielle is his daughter. Candace is Gail's daughter, and Cole and Cydney are her children.

II.     Elton's "mistake" was not a "mistake of fact or law" under Section 91-8-415 as a matter of law.

III.    The uncorroborated, after-the-fact testimony that a settlor would have distributed property in an unambiguous irrevocable trust differently had he "thought about it" cannot satisfy the high burden of clear and convincing evidence under Section 91-8-415 as a matter of law, or at least under the circumstances of this case.

The issues are discussed together below.

**ANALYSIS**

I.    **Whether the chancery court erred by finding that FMI had submitted clear and convincing evidence to support reformation of the termination provision of the Trust.**

¶11.   "This Court will not disturb a chancery court's findings of fact unless the chancery court 'abused its discretion, applied an erroneous legal standard, or its findings are manifestly wrong or clearly erroneous.'  This Court reviews questions of law de novo." ***Ware v. Ware (In re Est. of Ware)***, 348 So. 3d 277, 283 (Miss. 2022) (citations omitted) (quoting ***Flowers v. Boolos (In re Est. of Smith)***, 204 So. 3d 291, 305 (Miss. 2016)).

¶12.   The trial court found that FMI had submitted clear and convincing evidence showing that Elton had intended for the Trust's assets to pass to his lineal descendants upon termination.  It found Elton's testimony to be reliable and corroborated by Hibernia's testimony. Additionally, the trial court found that Gladys had not presented any evidence disputing Elton's intent at the time he executed the Trust.

¶13.   The Legislature enacted Mississippi's Uniform Trust Code (UTC) in 2014. Miss. Code Ann. § 91-8-101 to -1206 (Rev. 2021). Mississippi Code Section 91-8-1106 states that it "applies to all trusts created before, on, or after July 1, 2014" and "applies to all judicial

7

proceedings concerning trusts commenced on or after July 1, 2014." Miss. Code Ann. § 91-8-1106(a)(1), (2) (Rev. 2021). Therefore, the issue of reformation in this case falls under the UTC.

Section 91-8-415 provides that

> The court may reform the terms of a trust, even if unambiguous, to conform the terms to the settlor's intention if it is proved by clear and convincing evidence *what the settlor's intention was* and that the terms of the trust were affected by a mistake of fact or law, whether in expression or inducement.

Miss. Code Ann. § 91-8-415 (emphasis added). Thus, in order to reform the terms of a trust, Section 91-8-415 requires proof by clear and convincing evidence: 1) of "what the settlor's intention was" at the time the Trust was created, and 2) "that the terms of the trust were affected by a mistake of fact or law, whether in expression or inducement." *Id.* The language of Section 91-8-415 derives from the Uniform Trust Code. Unif. Tr. Code § 415 (Unif. L. Comm'n 2000). The official comments to the Uniform Trust Code provide:

> A mistake of expression occurs when the terms of the trust misstate the settlor's intention, fail to include a term that was intended to be included, or include a term that was not intended to be included. A mistake in the inducement occurs when the terms of the trust accurately reflect what the settlor intended to be included or excluded but this intention was based on a mistake of fact or law. Mistakes of expression are frequently caused by scriveners' errors while mistakes of inducement often trace to errors of the settlor.

Unif. Tr. Code § 415 cmt. (citation omitted). Thus, in this case, a mistake of expression is at issue.

¶14.    The comment further explains that reformation differs from ambiguity. *Id.* It states that reformation:

8

may involve the addition of language not originally in the instrument, or the deletion of language originally included by mistake, if necessary to conform the instrument to the settlor's intent. Because reformation may involve the addition of language to the instrument, or the deletion of language that may appear clear on its face, reliance on extrinsic evidence is essential. To guard against the possibility of unreliable or contrived evidence in such circumstance, the higher standard of clear and convincing proof is required.

*Id.* (citation omitted). This Court previously has defined clear and convincing evidence as

[t]hat weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.

***Miss. Comm'n on Jud. Performance v. Shoemake***, 191 So. 3d 1211, 1218 (Miss. 2016) (alteration in original) (quoting ***Miss. Comm'n on Jud. Performance v. Carver***, 107 So. 3d 964, 969-70 (Miss. 2013)). The Uniform Trust Code also states in comment to Section 415 that, "[i]n determining the settlor's original intent, the court may consider evidence relevant to the settlor's intention even though it contradicts an apparent plain meaning of the text." Unif. Tr. Code § 415 cmt.

¶15.    At trial, Elton testified that, in 1992, Earl had drafted the Trust and had brought it to Elton to read. Elton, however, further testified that he did not read it. When asked why Elton did not read the document, he stated:

I just—the way I did business, and still do to this day, is the attorney took care of whatever I asked them to do, and also my CPA. You know, once I told them what I would like to accomplish, then they took care of it and I never went behind and—which I should have, I guess. I never went behind and checked everything.

Elton testified that he had not spoken to Earl about what would happen when the Trust

terminated. Elton also stated that between 1992 and 2019 or 2020, he had not read the termination clause in the Trust.

¶16.   According to Elton, he was in a boardroom meeting with his trust attorney in the latter part of 2019 or the early part of 2020 when he first discovered the termination clause. Elton testified that after he discovered the termination clause, he told Glynn he "screwed up." Elton additionally testified that Glynn had never asked him to modify the Trust.

¶17.   Testimony established that Elton's business practices were prolific. Elton testified that, in 1974, he began leasing nursing homes, and his business grew extensively from there.[6] When asked why he created the Trust, Elton testified that he had been successful and that he had wanted to share his success, so he came up with the names of sixteen people that he wanted to assist. He stated that he also created the Trust for asset protection planning and put properties in the Trust for the same reason.

¶18.   Elton testified that he would not have continued to put assets in the Trust had he known about the termination clause. He stated that he would not have continued to grow the value of the trust "to take care of people that I don't even know and that maybe some of them not even born yet. It just doesn't make sense." Elton testified:

> I think that I'm smart enough, if I had read that, I would have said, Whoa, and I would have continued to support the people that were the beneficiaries, but I wouldn't be—I wouldn't be trying to take care of their issue. And I even told my three kids—of course, I don't know that I've lived up to this, but I told them, I'm going to help you but you're going to help your own kids. I'm not taking that responsibility.

---

[6]Glynn testified that the Beebe family owns, operates, and manages approximately fifty nursing homes in Louisiana and Mississippi.

10

> But here is this document I'm taking a lot more responsibility. So I just—I know that I would not have done that. I mean, the document says what it says. It was my fault for not studying the document. The gentleman that brought it to my attention was explaining other things besides this of what everything—how everything was going to fit and flow in my estate planning.

Elton stated that he "would have hoped it would have said that after all the beneficiaries passed that it would go to my issues."

¶19.	When asked about the characterization of Elton's testimony that he "didn't think about" the termination provision of the Trust, Elton responded:

> Well, I'm not sure that is the right word. I mean, in my whole lifetime my kids have been my main concern, so to think that I didn't think about that, I said it was a mistake on my part for not reading the document, and it was also a mistake on the attorney's part for not going over the main points of it with me. I admit that I did not read the document. And I didn't find out about this until, I think it was 2020.
>
> . . . .
>
> Well, I never thought about it. Yeah, I guess I would have believed that in the end—because in looking at all the beneficiaries, and I named all those, looking at that, it was obvious to me that probably my kids would be, hopefully, the last survivors, and so I just thought, you know—I never—but I never confirmed that, so that's my fault. That's all I'm saying.[7]

¶20.	Hibernia's deposition testimony also was submitted into evidence. Elton testified that Hibernia was who he had "relied on most in my business and also with my family." He testified that he had an extreme amount of confidence in Hibernia and that he had discussed both business and personal matters with Hibernia. Glynn also testified that Hibernia worked for his father for a very long time and "was involved in all of his business dealings." He stated that Hibernia also managed Elton's personal life.

---

[7]Elton's children were "significantly younger" than the other named beneficiaries.

11

¶21.    Hibernia testified that she had worked for Elton for more than thirty years, from approximately 1980 until her retirement in 2012. When Elton formed his company Magnolia Management in 1980, Hibernia started out as his secretary and did accounting work and then eventually moved into more of an administrative assistant position. Hibernia testified that she was very involved in Elton's businesses and stated that, if the company was going to purchase a nursing home, she would have been aware of it. She also had frequently spoken with Earl and would type the dictation for Elton's letters. Hibernia stated that, before the Trust was created, she had been familiar with Elton's will and had conversations with Elton and Keyes about it.

¶22.    Hibernia spoke of Elton's generosity and of his desire to make sure that his family was taken care of. She stated that Elton was very family oriented and "was focused on . . . his generation of family. He was just a kind, generous man." Hibernia testified that she did not believe that Section 3.2 reflected Elton's intent. Instead, Hibernia believed that Elton had wanted to take care of the named beneficiaries during their lifetimes but that when the Trust terminated, he would want the Trust's assets to be shared by his lineal descendants.

¶23.    Hibernia testified that she had not read the Trust before she signed it and that she had not spoken with Elton specifically about what would happen when the Trust terminated. Hibernia corroborated Elton's testimony that Elton and she had trusted their accountants, financial advisers, and attorneys. According to Hibernia, when Elton's attorney or financial advisor had presented a document to him, he would not sit down and read the entire document but would sign it after the professionals advised him "that everything was right and

12

okay."

¶24. Hibernia also submitted an affidavit stating, in relevant part:

4. Section 3.2, as drafted does not accurately reflect the intentions and wishes of Elton G. Beebe, Sr., as conveyed to me on or before the 14th day of August, 1992.

5. Rather, it was my understanding the Trust would provide that, upon termination, due to the death of the last to die of sixteen (16) named individuals in Section 1.7, the remaining principal and accumulated income would be distributed in equal shares to the lineal descendants of Elton G. Beebe, Sr., *per stirpes.*

6. I have direct knowledge that Elton G. Beebe, Sr. never intended the property of the Trust, upon termination, to be distributed to the lineal descendants of the sixteen (16) named lifetime beneficiaries; rather, it was the intention of Elton G. Beebe, Sr. that the property of the Trust, upon termination, be distributed to his lineal descendants.

¶25. Glynn testified that he was unsure whether he read the Trust when he signed it as a trustee in 1992. Regardless, Glynn did not speak to Elton about the termination clause in the Trust in 1992. Glynn stated that in 2014, when FMI and Four Generations were created, he was aware of Section 3.2 of the Trust but he had no reason to believe that the provision was not what his father had intended. He testified that he and Elton had extensive business dealings and that it had not crossed his mind to speak to his father about the termination clause at that time. Glynn did not have a discussion with Elton concerning the contents of Section 3.2 of the Trust between 2014 and 2019 or 2020.

¶26. Glynn testified that Elton was in his late eighties and over the last few years had begun estate planning to "prepare for his demise." Glynn testified that in either 2019 or 2020, Elton stated to him: "Son, I screwed up. . . . The Family Mortgage Trust, the way the document is

13

written is not what I meant to do, is not my intent. . . . When it terminates the document says it goes to the beneficiaries of the 16 named beneficiaries. . . . I was trying to take care of those beneficiaries and I thought that when the last beneficiary died it reverted back to my lineal descendants." Glynn testified that at the time Elton informed him of the mistake, he did not think there was anything that he could do about it. Upon mentioning the issue to an attorney, however, Glynn realized that it was his responsibility as trustee to file the current petition.

¶27. Susan, also an initial trustee, submitted an affidavit stating that she had no direct knowledge pertaining to Elton's specific intent regarding Section 3.2 when the Trust was formed.

¶28. In contrast, the Respondents contend that Elton had changed his intention regarding the termination clause of the Trust after a family argument in 2019. Elton's brother Harold had owned home health agencies. As Harold's health declined, Lance, Harold's grandson, took over the home health agencies in 2015. At that time, Elton looked into Harold's finances and noted that Harold had approximately $12 million in cash in Business Management Services, which owned several home health agencies around Louisiana.

¶29. Harold's health continued to decline. In December 2018, Harold and Gladys began receiving monthly payments of approximately $13,000 from the Trust to equal Harold's salary. Harold then passed away in July 2019. Elton testified that at the time of Harold's death, Elton did not have knowledge of the termination clause in the Trust. Elton stated that, after Harold passed away, he again looked into Harold's finances and noticed that the cash

14

in Business Management Services had dropped to approximately $9 million. Elton determined that most of Harold's businesses were losing money and advised Gladys and Gail to sell the losing businesses and to keep the profitable one. Elton also asked for Gladys's expenses and stated that the Trust could support Gladys financially. Gladys and Gail disagreed with Elton, however, and kept the businesses. Elton stated that, at that point, he decided to recommend to the trustees that Gladys stop receiving money from the Trust.

¶30. In October 2019, Elton typed out a letter to Gladys, Gail, and Lance that he did not mail. The letter was admitted into evidence. It urged Gladys and Gail to reconsider their position regarding the unprofitable businesses. In the letter, Elton stated that continuing on the current path would unnecessarily deteriorate Harold's estate. He recommended a plan, as follows:

1. Close down all professional home health agencies with the exception of Minden. Eliminate home office expenses as soon as possible.

2. The Family Trust had offered to take over financial responsibility of Gladys and is still willing to do so if the plan can be executed.

3. Move all of the cash up to Business Management Services so it can be invested at a better rate than what it's at currently.

Elton then wrote, in relevant part:

Once the cash is accumulated—it looks to be around $9,000,000—Gladys could decide to distribute on a monthly, annual, or lump sum basis to the three children. Currently there is a Federal estate tax exemption of $11,000,000.00; however, prior to this change it was $5,000,000 and—if the Democrats regain office—this will be one of the first things they change. This would be a consideration for distributing now during the favorable tax situation.

Gladys currently has at least $1,500,000.00 outside of the company and, if she agrees, the $1,500,000.00 could go to you and Lance or it could all go to

15

Lance—it's whatever the two of you decide. If it did go to Lance, it would give him the wherewithal to purchase Minden at book value and allow him to operate a successful business that alone could support him and his family.

Please don't take my word for this, but at least discuss it with your attorney and CPA of the two options.

¶31.	Gail Smith, Gladys's daughter and Elton's niece, testified that she first learned of the Trust in March 2018. Gail testified that she has held power of attorney for Gladys "[s]ince right before [her] father passed away." When Harold passed away, Gladys was named as usufructuary of the companies. Around that time, Gladys was losing, or had lost, her hearing and eyesight. Gail testified that Gladys had problems hearing but "if you sit directly in front of her and speak—loudly speak to her, I don't know exactly because I haven't asked her this, but I don't know if she can read your lips, if she hears you well enough, but I know she understands you because she is very sharp and astute when she wants me to do something for her." Gail also testified that Gladys had glaucoma and could "see shadows." Gail stated that a contract would have to be read to Gladys.[8] The trial court additionally recognized that Gladys had significant impaired vision and hearing.

¶32.	Gail stated she spoke with Glynn in March 2018 and that Glynn had been upset about the Trust because of the termination clause. Gail testified that Glynn stated that he thought the Trust "should be for him and his sisters." Gail testified that Glynn next spoke to her in August 2019, after her father Harold passed away and that Glynn had informed her that Elton

_____

[8]On March 2, 2022, Gladys signed documents that transferred all of Gladys's usufructuary interest in the companies solely to Gail and not to her two sisters. Gail testified that Gladys's attorney had read the document to her. At the time of trial, two of Gladys's daughters were suing Gladys, Gail, Lance, and the businesses over a production of records "and things of that nature . . . ."

"was very upset" that Gladys did not sell Harold's unprofitable businesses.

¶33.    Gail stated that Elton had not discussed the Trust with her until after her father passed away. Gail testified that Elton called her in September 2019 and wanted to talk about the home health businesses. Gail stated that Elton told her at that time that she may never see any money from the Trust but her mother and her grandchildren would.

¶34.    Also submitted into evidence was Gladys's video deposition.[9] Gladys testified that she no longer worked in Harold's businesses and that she had not since before he passed away. She stated that Lance ran the businesses but kept her informed. She did not recall whether Elton had spoken to her about the home health businesses after Harold's death. Gladys also did not recall when she had found out about the Trust. Gladys stated that she did not recall whether Elton had discussed his intent regarding the Trust with her and testified that he had never discussed with her where he wanted the assets of the Trust to go once all of the sixteen beneficiaries had died. Gladys denied having any conversations with Elton about the Trust.

¶35.    Lance Smith, Gail's son, testified that in February 2015, he began running Harold's home health agencies and some hospice companies. Lance testified that Gladys makes all the business decisions and that he goes to her house once every ten days to discuss the businesses with her. When asked if they have any communication problems, he stated: "Well, I mean, I sit right next to her and speak loud. We have been doing it long enough that we don't—yeah, we don't have too many problems. I speak loud and I sit right next to her on the couch."

---

[9]At the time of trial, Gladys was 92 years of age and in poor health.

¶36. Lance stated that, in 2017 or 2018, Glynn told him about the Trust and stated that "one day it will even help your daughter out. It might not ever get to you unless you outlive Alison and me and Felicia, but that's the way it will work." Lance stated that Glynn had a list of the descendants of the beneficiaries and that he commented that there were people on the list that he did not know. Lance also testified that Glynn said "that he would speak to his father about it. He said, I'm going to try to look into this and just see if there's anything that can be done."

¶37. Lance stated that the first time he spoke with Elton about the Trust was in early 2018 at a meeting regarding closing several branches of the home health agencies. Lance stated that Elton informed him that there was a Trust and told him that his grandparents would never need money. Elton did not mention the termination provision in the Trust.

¶38. Lance testified that, in October 2019, Elton had contacted him and told him that the Trust would no longer support Gladys because he did not want "to throw good money after bad . . . ." Lance additionally testified that Elton had stated: "Look, I have to look after the money that's in that trust, you know, it's going to support a lot of people and you should be, you know, happy that I do look after it because one day your daughter will be well taken care of because of it."

¶39. On cross-examination, however, Lance testified that Elton had never expressed his intent in reforming the Trust and had never expressed any opinion as to what he thought was going to happen when the Trust terminates. Lance stated that Elton had not specifically told him anything about what would happen when the Trust terminated, "[j]ust the inferences that I drew . . . ."

¶40. Glynn testified that he had never discussed Section 3.2 of the Trust with Gail. He stated that he had spoken with Lance once about Section 3.2 on the way to Harold's funeral in July 2019. He testified that on the way to Harold's funeral, he told Lance that the Trust would continue to support Gladys and that "at some point down in the distant future it would potentially benefit their children and heirs." According to Glynn, the only other person he talked to regarding Section 3.2 was Greg, Lance's father.

¶41. Professor Amy Morris Hess, an expert in the field of trusts, testified that she had reviewed all of the depositions and heard all of the testimony in this case. She testified that the most common way to show clear and convincing evidence of a mistake would be to put the drafting attorney on the stand to testify. In Professor Hess's opinion, a settlor's statement alone that he made a mistake would not be considered clear and convincing evidence. Professor Hess opined that "there needs to be some form of corroboration that at the time the trust was created the settlor didn't know that a particular set of facts obtained and that if he had known those then he would have directed his lawyer to draft the document differently." Hess stated that she was "not sure how you can make a mistake about a fact you don't think about." Hess also testified that once an irrevocable trust is created, the beneficiaries have an interest.

¶42. John Dongieux, the guardian *ad litem* appointed to represent the minor nonlineal descendants, testified that all of the parents of the children that he represented had joined in the relief requested by Elton. Dongieux testified that he had written the parents of the minor children twice, and he largely received no response. He stated that no parent had voiced an

objection to the petition. Therefore, Dongieux testified that he took a neutral position in the case on behalf of the children.

¶43. The Respondents argue that the appropriate standard of review is de novo. They contend that what constitutes a "mistake of fact or law" under Section 91-8-415 is an issue of statutory interpretation. The Respondents argue that Elton's testimony that he had not thought about the Trust's distribution of property provision when the Trust was created demonstrates that Elton had no intent at all with respect to the distribution provision of the Trust. Therefore, according to the Respondents, there can be no "mistake of fact or law" under Section 91-8-415 because there was no intent.

¶44. We agree with the Respondents' contention that the relevant inquiry is what Elton's intent was in 1992 with respect to the distribution provision. *See **Shriners Hosps. for Crippled Child. v. Coltrane***, 465 So. 2d 1073, 1076 (Miss. 1985) ([A]lthough a will speaks as of the time of the testator's death, the testator's intent is manifested as of the time the will is executed." (citing ***Riegelhaupt v. Osroffsky***, 237 Miss. 521, 528, 115 So. 2d 331, 334 (1959))).Yet when creating the Trust, Elton clearly intended for the Trust's assets to go *somewhere* after the death of the last named beneficiary. And FMI presented factual testimony and evidence regarding Elton's intent at the time the Trust was created, including that Elton had trusted his attorney to draft the document according to his wishes. Elton also testified that his children were the youngest of the named beneficiaries and that he had hoped they would have been the last ones of the named beneficiaries to pass away.

> Much metaphysical exposition may be found regarding the nature and definition of the phrase 'a question of law.' Practically speaking, the phrase's

meaning may be shown by contrast, not definition. Some consider that the decisions of trial courts fall naturally into three broad categories: questions of law, questions of fact, and matters of discretion.

*Am. Elec. v. Singarayar*, 530 So. 2d 1319, 1322 (Miss. 1988) (quoting Maurice Rosenberg, *Appellate Review of Trial Court Discretion*, 79 F.R.D. 173 (1979)). Because FMI presented factual evidence of Elton's intent at the time the Trust was created, this matter falls within the chancellor's discretion.[10]

> We . . . recognize that the chancellor "being the only one to hear the testimony of witnesses and observe their demeanor, is to judge their credibility. He is best able to determine the veracity of their testimony, and this Court will not undermine the chancellor's authority by replacing his judgment with its own."

*Lewis v. Pagel*, 233 So. 3d 740, 746 (Miss. 2017) (quoting *Madden v. Rhodes*, 626 So. 2d 608, 616 (Miss. 1993)). Therefore, the chancellor did not commit legal error, and the correct standard of review is abuse of discretion.

¶45.    Although this Court has not previously analyzed Section 91-8-415, it recently has determined that reformation of a trust was warranted when a provision in a trust instrument was rendered ambiguous due to a scrivener's error that frustrated the intent of the grantor. *Ollin v. Richards (In re Est. of Blackburn)*, 299 So. 3d 781, 783 (Miss. 2020). There, this Court found that the scrivener's error caused the provision at issue to be contradictory and nonsensical. *Id.* at 787. Yet this Court emphasized that "one of 'the most solemn obligation[s] any court can have [is] to see that the true intent of the testator is carried out.'" *Id.* (alterations in original) (quoting *Sullivant v. Vick (In re Est. of Vick)*, 557 So. 2d 760,

_____

[10]*See **Parish Transp. LLC v. Jordan Carriers Inc.***, 327 So. 3d 45, 55 (Miss. 2021) ("We hold that the question of whether there is a valid electronic signature is dependent upon the person's intent when he or she executed the writing, which is a question of fact.").

21

765 (Miss. 1989)). Moreover, it stated that "[t]here is no Constitutional right more jealously safeguarded than the absolute freedom of a testator to dispose of his own property as he chooses." *Id.* (internal quotation marks omitted) (quoting *In re Est. of Vick*, 557 So. 2d at 765).

¶46.    The grantor in *Blackburn* was an estate planning attorney. *Id.* at 783. In addition to finding that the error rendered the provision nonsensical, this Court looked to the trial testimony to determine the grantor's true intention. One of the grantor's paralegals, who was also a cotrustee of the trust, testified that she had worked for the grantor for many years and that she had a "brother-sister" relationship with the grantor. *Id.* at 785 (internal quotation marks omitted). She testified that the grantor "was very big on legacy" and that "he believed everybody should leave things to family generations." *Id.* The paralegal also testified that she had drafted the trust and was emphatic in her testimony that the language was in error. *Id.* A second paralegal, also a cotrustee, testified that the grantor "did not 'read documents word for word.'" *Id.* She also was emphatic that the trust document contained an error and that the grantor had desired to keep his property within the family. *Id.*

¶47.    Here, the drafter of the Trust was deceased; therefore, his testimony was unavailable. Further, the termination provision at issue is undisputedly unambiguous. Even so, Section 91-8-415 allows for unambiguous terms of a trust to be reformed to reflect the settlor's intention. Miss. Code Ann. § 91-8-415. And similarities to *Blackburn* exist in the record. Elton testified that his business was extensive and that he was unable to read every business document. He stated that he had not read the Trust document and had trusted that his attorney

had drafted it in accordance with his intentions. Elton also testified that he would not have continued growing the Trust if he had known about the termination provision because he did not want to take care of people that he did not know.

¶48.    Hibernia also testified that Elton had trusted his attorney and advisors and that he did not read every document before signing it. She stated that she had worked for him for more than thirty years and was heavily involved in the business as well as in Elton's personal life. Hibernia stated that Elton would have wanted to take care of the named beneficiaries during their lifetime but would have wanted the Trust's assets to go to his own lineal descendants when the Trust terminated.

¶49.    The Respondents cite *Hillhouse v. Chris Cook Construction, LLC*, 325 So. 3d 646, 652 (Miss. 2021) (internal quotation marks omitted), and argue that this Court previously has rejected reformations based on "secret thought[s]" of the parties executing the documents. They further argue a principle of contract law, that "[t]o permit a party when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts." *Tel-Com Mgmt., Inc. v. Waveland Resort Inns, Inc.*, 782 So. 2d 149, 153 (Miss. 2001) (internal quotation marks omitted) (quoting *Hicks v. Bridges*, 580 So. 2d 743, 746 (Miss. 1991)). Yet those cases involved contractual issues. As the Supreme Court of Montana has held, "[w]hile the mutual intent of the parties is the appropriate standard by which a contract may be reformed, a donative instrument is by its nature unilateral, and its terms depend only on the intent of the donor."

23

*Est. of Irvine v. Oaas*, 309 P.3d 986, 990 (Mont. 2013) (citing *Laundreville v. Mero*, 281 P. 749, 752 (Mont. 1929), *overruled on other grounds by* *Wilson v. Davis*, 103 P.2d 149 (Mont. 1940)). "The trend away from insisting on strict compliance with statutory formalities is based on a growing acceptance of the broader principle that mistake, whether in execution or in expression, should not be allowed to defeat intention." Restatement (Third) of Prop.: Wills & Donative Transfers § 12.1 (2003), Westlaw (database updated Oct. 2023).[11]

¶50. The Respondents rely on an unpublished Delaware chancery court case in which the Delaware court denied a motion for reformation based on the lack of evidence regarding the grantor's intent as to a trust protector provision and found that "after-the-fact regret is not

---

[11]The dissent cites this Court's previous holding that "[g]eneral rules of construction of written instruments apply to the construction of trust instruments, whether they are contracts, deeds, or wills." *Hart v. First Nat'l Bank of Jackson*, 233 Miss. 766, 103 So. 2d 406, 409 (1958) (internal quotation mark omitted) (quoting 54 Am. Jur. *Trusts* § 17). Yet the *Hart* Court recognized that "the creation of the trust is a unilateral matter . . . ." and that "the intention of the settlor" is of utmost importance. *Id.* Whereas,

> "It is, of course, a basic principle of the law of contracts that a contract is not formed between the parties absent the essential elements of offer, acceptance, and consideration." "The elements of a contract are (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation."

*Gulf Coast Hospice LLC v. LHC Grp. Inc.*, 273 So. 3d 721, 734 (Miss. 2019) (citations omitted). Therefore, there is an integral difference between the law of trusts and contract laws, and in the law of trusts, the intent of the settlor overrides all. Further, in *Hart*, the Court looked solely to the wording of the instrument to determine the testators' intent because the testimony of the testators was unavailable. *Hart*, 103 So. 2d at 412. Here, however, the testimony of the settlor himself is available to determine his intent, in addition to the language in the Trust. Thus, even though the Trust is by its terms an irrevocable trust, the legislature has provided a statutory provision to amend such irrevocable trusts to conform to the settlor's intent.

relevant to the intent inquiry." ***In re Jeremy Paradise Dynasty Tr.***, No. 2021-03540KSJM, 2023 WL 1241903, at *16 (Del. Ch. Jan. 31, 2023). The ***Paradise*** case involved two trusts created by two brothers for the purpose of holding stock in a technology company. ***Id.*** at *1. Andrew Paradise cofounded a company, and his brother Jeremy Paradise received part of the equity. ***Id.*** at *2. After Jeremy's request for a loan from Andrew, Andrew suggested that Jeremy place his shares in the company in trust, in part to protect Jeremy from Andrew's belief that he was overspending. ***Id.*** The brothers eventually agreed to a two-trust structure, which involved Andrew establishing a trust to house a portion of Andrew's stock in the company for Jeremy's benefit. ***Id.*** at *3. As a result, Jeremy agreed to transfer his remaining stock in the company to a separate trust for the benefit of their mother and Jeremy's unborn child. ***Id.*** Extensive evidence was provided to show the drafting history of the trusts, including Andrew's multiple requests to Jeremy asking whether he had reviewed drafts of the trust documents. ***Id.*** at *4.

¶51.    Although Jeremy received the drafts of the trust documents, Jeremy admittedly stopped reading drafts and informed his brother that he would read the final drafts when they were ready to sign. ***Id.*** In the meantime, the trusts were updated to put Andrew "in the first position to remove and replace the Trust Protector under both Trust Agreements." ***Id.*** The Delaware court wrote that

> Jeremy did not plan to read the Trust Agreements for a few reasons. For one, he was distracted by important life events—his "son had just been born, or was about to be born." For another, he "just didn't have that much interest in" . . . the "tax stuff" and other matters. In response to Andrew's text, Jeremy wrote, "I'll sign whenever you tell me they are ready . . . . I'm just going to trust your edits." By this, Jeremy meant that he did not intend to read the drafts. And he

25

did not read the drafts at the time. At most, he said, he "read a little bit" of the very first draft of the Jeremy Trust Agreement, but nothing beyond that. In late March, Jeremy "figured [his] brother was just taking care of everything" and testified that "he did not feel like participating or editing anything anymore."

*Id.* at \*5 (alterations in original) (footnotes omitted) (citations omitted). Jeremy signed the final version of the Jeremy Trust Agreement without asking any questions about the provisions. *Id.*

¶52.   The Delaware court held:

The strongest inference from the record is that [the grantor] had *no* clear intent regarding Section 12(h) at the time he executed the Jeremy Trust Agreement because he had not read the documents, had no interest in their contents, and was focused on other life events. A lack of understanding is not the sort of clear intent needed to support a claim for reformation. And it would make bad policy for this court to allow a party to rewrite trust terms which the party comes to dislike years after executing a trust agreement.

*Id.* at \*16.

¶53.   The instant case can be distinguished. First, Delaware has not adopted the UTC. Second, substantial evidence against reformation was submitted in ***Paradise***. In this case, we agree with the trial court's conclusion that the "Respondents did not present any evidence disputing Elton's intent at the time he executed the Trust" and the testimonies of Lance, Gail, and Gladys were inconsistent. In ***Paradise***, despite being urged to participate in the drafting process of the trust and to give input, the grantor willfully chose not to read the trust document due to a lack of interest and life events. Yet Elton's testimony, supported by Hibernia's testimony, did not show a willful ignorance of the drafting process and an outright refusal to participate. Instead, his and Hibernia's testimonies showed that he was a successful businessman who relied on his trusted attorney to draft documents according to his will.

26

Lastly, outside of asset protection, Elton received no benefit from creating the Trust.

¶54.    The trial court quoted ***Berman v. Sandler*** and its holding that "[i]ncluded in the category of unilateral mistakes for which relief may be obtained is a settlor's acceptance of a trust instrument which, because of the mistake or inadvertence of the scrivener, fails to embody the settlor's intentions." ***Berman v. Sandler***, 399 N.E.2d 17, 19 (Mass. 1980). The trial court additionally quoted ***In re Estate of Tuthill***, 754 A.2d 272, 276 (D.C. 2000), and its holding that "the law does not require a party to produce any particular evidence to support its obligation under the clear and convincing evidence standard for reformation of a trust . . . ."

¶55.    The Respondents argue that those cases involved the settlor's clear communication of intent to the drafter of the trust. The trial court did not conduct a factual analysis on those cases, however, but cited the law and applied it to the facts of this case. Here, with the exception of the Respondents, all adult beneficiaries consented to the proposed reformation. The parents of the nonlineal descendants, along with the guardian *ad litem* appointed to represent them, also voiced no objection to the reformation.

¶56.    Further, Elton testified that he instructed his attorney to create the Trust for the lifetime benefit of sixteen named individuals, including his ex-wife and his brother's ex-wife. Elton testified that his kids had been the main concern for his entire lifetime and that it was pretty obvious to him that his kids, being by far the youngest named beneficiaries, would be the last beneficiaries to survive.[12] Elton further testified that the Trust is worth approximately

_____

[12]This Court previously has held in high esteem the blood kin of a testator over more removed relationships. It stated, "[w]e think that it is further of significance that the

$80 million, "which is a lot more than I'm worth and a lot more than adding up all my other little trusts combined." He stated that he would not have continued to grow the value of the trust "to take care of people that I don't even know and that maybe some of them not even born yet. It just doesn't make sense."

¶57.    Elton also pointed out that, because the youngest named beneficiary was fifty years old at the time the petition was filed, the termination provision contained in the Trust would likely lead to a vast number of beneficiaries. Hibernia corroborated Elton's testimony. She spoke about Elton's generosity but stated that his ultimate focus was on his family line. The Respondents presented no contrary testimony as to Elton's intent at the time the Trust was created. We find that FMI submitted sufficient evidence showing that the termination provision in the Trust was a mistake of expression that did not evidence Elton's intent at the time the Trust was created. Thus, the trial court did not abuse its discretion by reforming the Trust to conform to Elton's original intent.

## CONCLUSION

¶58.    The trial court did not abuse its discretion by finding that FMI had proved by clear and

_____

remaindermen in the instrument are heirs at law of the trustors, that is to say, they are blood kin. It is more reasonable to conclude that the trustors were more concerned about preserving the estate for their blood kin than for one merely related by marriage as was the status of [the beneficiary's widow.]" *Hart*, 103 So. 2d at 411. "It is further a well recognized rule of construction that doubtful provisions will be construed favorably to the next of kin as against those of more remote kinship of the testatrix or trustor." *Id.* (quoting *Cross v. O'Cavanagh*, 198 Miss. 137, 147, 21 So. 2d 473 (1945)); *see also* ***D'Evereaux Hall Orphan Asylum v. Green***, 226 So. 2d 725, 730 (Miss. 1969) ("The court also found significant the fact that the remaindermen in the *Hart* case were heirs at law of the trustors, stating that it was reasonable to conclude that the trustors were concerned about preserving the estate for the blood kin, more so than for one (the annuitant) merely related by marriage." (citing *Hart*, 103 So. 2d at 411)).

convincing evidence Elton's intention at the time he created the Trust and the mistake in expression affecting the Trust. Therefore, we affirm the decision of the trial court.

¶59. **AFFIRMED.**

**KITCHENS, P.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, C.J.**

**GRIFFIS, JUSTICE, DISSENTING:**

¶60. I respectfully disagree and dissent.

¶61. The issue here is whether the chancery court may reform the Elton G. Beebe, Sr., Irrevocable Family Mortgage Trust (Trust), executed by Elton on August 14, 1992, under Mississippi Code Section 91-8-415, which provides:

> The court may reform the terms of a trust, even if unambiguous, to conform the terms to the settlor's intention *if it is proved by clear and convincing evidence what the settlor's intention was and that the terms of the trust were affected by a mistake of fact or law*, whether in expression or inducement.

Miss. Code Ann. § 91-8-415 (Rev. 2021) (emphasis added).

¶62. Family Management, Inc. (FMI), must prove by clear and convincing evidence first, what Elton's "intention was" in 1992 as to the distribution provision, and second, that "a mistake of fact or law, whether in expression or inducement" occurred in incorporating that intent into the Trust document. *Id.*

    *1.    What was the settlor's intention?*

¶63. The first issue presented is whether there was clear and convincing evidence to prove "what [Elton]'s intention was" when he executed the Trust in 1992. *Id.*

29

### A.    Elton's Testimony

¶64.    Elton testified that before 2019, he "hadn't thought about what happens when this [T]rust terminates." On rebuttal, he testified, "I never thought about it." Then again on rebuttal cross-examination, Elton confirmed that he never "thought about what happens when this [T]rust terminates."

¶65.    Thus, there was no evidence, certainly not clear and convincing evidence, that Elton's intent in 1992 was different than what was written in the Trust. The chancery court and the majority simply have no legal grounds to support a finding that Elton's intention in creating the Trust in 1992 was different than what was written in the Trust document. Indeed, Elton's own testimony does not establish what Elton's intention was in 1992. Rather, Elton's testimony proved he had no intention other than what was written in the Trust.

### B.    Mississippi law imposed a duty on Elton to read and understand the Trust when he signed it.

¶66.    Elton testified that he did not read the Trust before signing it. Elton explained that that was "the way [he] did business," that "his attorney[s] took care of whatever [he] asked them to do," and that "once [he] told them what [he] would like to accomplish, then they took care of it and [he] never went behind and . . . checked everything." Elton stated he *first became aware of* the contents of Section 3.2 "at the . . . end of [20]19 or beginning of [20]20." After learning of Section 3.2, Elton told his son Glynn that he had "screwed up."

¶67.    The chancellor and the majority ignore the fact that Elton had a duty to read and understand any document he signs, including an *irrevocable and unamendable* trust. The majority's decision to casually dismiss the application of contract law is dangerous and

30

simply wrong.  The majority cites but then rejects a well-established premise of Mississippi

contract law:

> "[T]o permit a party when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations, *would absolutely destroy the value of all contracts*." ***Tel-Com Mgmt., Inc. v. Waveland Resort Inns, Inc.***, 782 So. 2d 149, 153 (Miss. 2001) (internal quotation marks omitted) (quoting ***Hicks v. Bridges***, 580 So. 2d 743, 746 (Miss. 1991)).

Maj. Op. ¶ 49 (emphasis added).  The majority dismisses this well-established legal principle

without citing any Mississippi law.  Instead, the majority relies on Montana law:

> As the Supreme Court of Montana has held, "[w]hile the mutual intent of the parties is the appropriate standard by which a contract may be reformed, a donative instrument is by its nature unilateral, and its terms depend only on the intent of the donor." ***Est. of Irvine v. Oaas***, 309 P. 3d 986, 990 (Mont. 2013) (citing ***Laundreville v. Mero***, 281 P. 749, 752 (Mont. 1929), *overruled on other grounds by* ***Wilson v. Davis***, 103 P.2d 149 (Mont. 1940)).

Maj. Op. ¶ 49.

¶68.   In Mississippi, the fact that the Trust is a donative instrument does not somehow

remove it from the rules of contract interpretation and principles of Mississippi law.  Indeed,

this Court has expressly ruled that "trust instruments" are subject to the "general rules of

construction of written instruments[.]" ***Hart v. First Nat'l Bank of Jackson***, 233 Miss. 766,

103 So. 2d 406, 409 (1958) (citing 54 Am. Jur. *Trusts* § 17).  In ***Hart***, this Court held:

> It is generally recognized that *general rules of construction of written instruments apply to the construction of trust instruments* whether they are contracts, deeds, or wills. 54 Am. Jur., Trusts, Sec. 17. The prime inquiry in the construction of a will or trust instrument is the intention of the testator or the trustor, and in ascertaining this intent, effect must be given to the plain and unambiguous language used in the trust instrument. ***In re Vail's Will, Miss.***, 87 So. 2d 68.

31

In 54 Am. Jur., Trusts, Sec. 17, it is said: 'General rules of construction of written instruments apply to the construction of trust instruments, whether they are contracts, deeds, or wills. The cardinal rule of construction is, of course, to determine the intention of the settlor, where the creation of the trust is a unilateral matter, and to determine the intention of the parties, where such creation is a bilateral matter. Due weight must be given to all words used by the trustor in determining his intention. The object construing an instrument creating a trust is to ascertain the intent and purpose of the settlor, and to effectuate that purpose insofar as it is consistent with the rules of law.

'In the case of a trust based on a written instrument, the intention of the trustor is to be ascertained from the language thereof, and the court may not go outside the language in an effort to give effect to what it conceives to have been the actual intent or motive of the trustor. If the language is unambiguous and perfectly clear, there is no field for the play of construction; if the trustor has clearly expressed one intention, the court cannot impute to him another, and parol evidence is inadmissible to add, take away from, or even to explain such clear expression of intention . . . .'

*Hart*, 103 So. 2d at 409-10 (emphasis added).

¶69.    Based on Mississippi rules of construction of written instruments, i.e., the Trust, the chancellor and the majority are in error not to find that Elton had a duty to read and understand any document he signs, including the *irrevocable and unamendable* Trust.  In *United Credit Corp. v. Hubbard*, this Court held:

> "[I]n Mississippi, a person is charged with knowing the contents of any documents that he executes." *Russell v. Performance Toyota, Inc.*, 826 So. 2d 719, 726 (Miss. 2002) (citing *J.R. Watkins Co. v. Runnels*, 252 Miss. 87, 96, 172 So. 2d 567, 571 (1965) (holding that "A person cannot avoid a written contract which he has entered into on the ground that he did not read it or have it read to.")).

*United Credit Corp. v. Hubbard*, 905 So. 2d 1176, 1178 (Miss. 2004).  Since Elton had a duty to read and understand the Trust at the time he executed the Trust, Mississippi law does not allow the Court to ignore the text of the instrument to determine the settlor's intent.

¶70.   Additionally, it is undisputed that the Trust is clear and unambiguous. In ***Facilities,***

***Inc. v. Rogers-Usry Chevrolet, Inc.***, the Court ruled:

> "'Questions concerning the construction of contracts are questions of law that are committed to the court rather than questions of fact committed to the fact finder.'" We . . . employ the de novo standard of review for questions of law.

> "The primary purpose of all contract construction principles and methods is to determine and record the intent of the contracting parties." "'In contract construction cases, this Court's focus is upon the objective fact-the language of the contract. We are concerned with what the contracting parties have said to each other, not some secret thought of one not communicated to the other.'"

> This Court has stated:

>> This Court has set out a three-tiered approach to contract interpretation. Legal purpose or intent should first be sought in an objective reading of the words employed in the contract to the exclusion of parol or extrinsic evidence. First, the "four corners" test is applied, wherein the reviewing court looks to the language that the parties used in expressing their agreement. We must look to the "four corners" of the contract whenever possible to determine how to interpret it. When construing a contract, we will read the contract as a whole, so as to give effect to all of its clauses. Our concern is not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy. Thus, the courts are not at liberty to infer intent contrary to that emanating from the text at issue. On the other hand, if the contract is unclear or ambiguous, the court should attempt to "harmonize the provisions in accord with the parties' apparent intent." Only if the contract is unclear or ambiguous can a court go beyond the text to determine the parties' true intent. . . .

***Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.,*** 908 So. 2d 107, 110-11 (Miss. 2005)

33

(citations omitted).

¶71. Finally, Elton's decision to sign the Trust is important. Under Mississippi law, "a person is charged with knowing the contents of any documents that [he] executes." *United Credit Corp.*, 905 So. 2d at 1178 (internal quotation mark omitted) (quoting *Russell*, 826 So. 2d at 726). "To permit a party when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations, *would absolutely destroy the value of all contracts*." *Tel-Com Mgmt.*, 782 So. 2d at 153 (emphasis added) (internal quotation marks omitted) (quoting *Hicks*, 580 So. 2d at 746).

¶72. The Trust is a simple legal document, six pages and double spaced. The Trust, however, is not just a simple trust. The Trust was neither an unfunded trust nor a dormant trust waiting to be used in the event of someone's death or a specific event. The Trust has been in existence and operational for thirty years.

¶73. This Trust was a sophisticated business trust that was very important and essential to Elton's business operations. It was not Elton's only trust. Instead, the Trust was significant enough that Elton *chose to contribute assets valued at approximately $80 million in the Trust*. The Trust owned and operated the real estate and facilities of thirteen nursing homes, a 30 percent ownership interest in an insurance company, and a hunting club.

¶74. Judicial review, even under Section 91-8-415, requires that we start with the duty imposed by Mississippi law that Elton read and understood the Trust when he signed it. This duty is important. The fact that Elton signed the Trust yet failed to read the Trust cannot be

34

clear and convincing evidence that Elton's intent in 1992 was different than what was written in the Trust. Rather, the duty must be accepted as the settlor's intent upon execution. Deciding this case otherwise is what the Court meant when it stated that this decision "*absolutely destroy[s] the value of all contracts*[,]" especially trusts. **Id.** (emphasis added) (internal quotation mark omitted) (quoting **Hicks**, 580 So. 2d at 746). There was no evidence, certainly not clear and convincing evidence, that Elton's intent in 1992 was different than what was written in the Trust. Mississippi law requires we accept what was written in the Trust as Elton's clear intent. The chancery court and the majority simply have no legal grounds to support a finding that Elton's intention in creating the Trust in 1992 was different than what was written in the Trust document.

   2.    *Whether the terms of the trust were affected by a mistake of fact or law, whether in expression or inducement?*

¶75.   The second issue presented is whether there was clear and convincing evidence to prove that "a mistake of fact or law, whether in expression or inducement" occurred in incorporating that intent into the Trust document. Miss. Code Ann. § 91-8-415.  Again, we must begin with Elton's testimony that he "hadn't thought about what happens when this [T]rust terminates" and "never thought about it."  There simply cannot be a mistake if Elton "never thought about it."

¶76.   Elton testified he made a mistake after the formation of the Trust by placing approximately $80 million in the Trust without considering to whom those trust funds would be distributed when the trust terminates.  Elton testified that "if [he] would have looked at what the trust document sa[id], [Section] 3.2, . . . [he] would not have put the assets in there

35

that [he] ended up putting in there because that [wa]s stupid." Elton explained that had he read the Trust, he "would not have continued to grow the value of that company or [T]rust to take care of people that [he] d[id]n't even know[.]" Elton stated that "[h]ad [he] read [Section 3.2], [he] would have said, 'Whoa,' and [he] would have continued to support the people that were the beneficiaries, but [he] wouldn't be . . . trying to take care of their issue."

¶77.　Additionally, Elton testified that until 2019, he had never "thought about what happen[ed] when th[e] [T]rust terminates," and therefore, he had never spoken with anyone—including his drafting attorney, the five original trustees of the Trust, or the beneficiaries—about the Trust's termination distribution provision prior to 2019. According to Elton, prior to 2019, he "hadn't really thought through what [the termination distribution provision] would be." Elton further testified he "didn't talk to" anyone, including Hibernia Williams, "about what [his] intentions were about [the termination provision] because [he] hadn't thought about that fact."

¶78.　In an attempt to clarify his intent regarding Section 3.2, Elton testified,

> Well, I never thought about it. Yeah, I guess I would have believed that in the end—because in looking at all the beneficiaries, and I named all those, looking at that, it was obvious to me that probably my kids would be, hopefully, the last survivors, and so I just thought, you know—I *never—but I never confirmed that*, so that's my fault. That's all I'm saying.

(Emphasis added.) But if Elton had had a clear intent in 1992 to distribute the Trust property only to his lineal descendants, and if his attorney, Earl Keyes, had made a mistake in drafting the Trust document, Elton could have and would have testified to that, but he did not. Instead, Elton testified that he "never thought about it" and admitted that he "never

36

confirmed" his intent.

¶79. Elton created the Trust with the assistance of his personal attorney. Elton then operated the Trust for almost thirty years and contributed approximately $80 million of assets to the Trust without looking at or considering who would be the beneficiaries when the Trust terminates.

¶80. The Trust named sixteen individual beneficiaries in Section 1.7. Elton testified at trial that he "picked out who [he] would like to assist if they needed it, or even if they didn't need it." Elton "came up . . . with sixteen names" and provided that information to his attorney to draft the Trust. Keyes followed Elton's instructions, and Elton admits that the Trust correctly named the sixteen beneficiaries, as he intended in 1992. There is no question that Elton himself decided to name these sixteen individuals as beneficiaries of the Trust. Notably, Section 1.7 simply identified the beneficiaries. Section 1.7 did not distinguish "lifetime" versus "remainder" beneficiaries.

¶81. The Trust included two distribution provisions. Section 3.1 authorized the trustees to distribute Trust income and principal "in their discretion" to any of the sixteen named beneficiaries for their "support, welfare, and maintenance." Section 3.2 provides that the Trust "shall terminate *upon the death of the last of the named beneficiaries* to die." (Emphasis added.) Upon termination, the remaining Trust assets "shall be distributed in equal shares *to the descendants of the named beneficiaries*, or their issue, per stirpes." (Emphasis added.)

¶82. Now, thirty years later, Elton claims his mistake was that the remaining Trust assets

should be distributed in equal shares to *his* descendants, or their issue, per stirpes. Elton asserts Section 3.2 was the result of an alleged "scrivener's error" in Keyes's drafting of the Trust. But Elton's "mistakes" of not reading, not thinking about, and not considering the termination distribution provision of the Trust did not result in a "scrivener's error" in the Trust. Elton clearly testified that *he had not thought about what would happen when the Trust terminates*. Because there is no evidence that Elton had thought about it and had conveyed that intent to his attorney, there can be no evidence of a scrivener's error.

¶83.    Moreover, Elton's "mistakes" in not reading, thinking about, or considering the termination distribution provision of the trust are not "mistake[s] of fact or law, whether in expression or inducement." Miss. Code Ann. § 91-8-415. A mistake in expression occurs when a settlor clearly communicates his intent to the drafter of the trust and, because of a mistake by the drafter, the settlor's communicated intent is not transcribed in the trust document. *See* Unif. Tr. Code § 415 cmt. ("A mistake of expression occurs when the terms of the trust misstate the settlor's intention, fail to include a term that was intended to be included, or include a term that was not intended to be included."). That did not occur here. Elton never testified that any "mistake of fact or law" occurred. Miss. Code Ann. § 91-8-415. Elton never testified that he instructed his attorney to draft the Trust one way and that his attorney drafted it another way, i.e., a mistake of fact in expression. He never testified that he or his attorney were mistaken about any fact. Instead, Elton testified that he instructed his attorney to draft an irrevocable trust benefitting the sixteen named beneficiaries, and that is what his attorney did. Elton admitted that he "hadn't thought about"

38

the termination distribution provision at issue and did not talk to anyone about that provision until twenty-seven years after the Trust's execution. Because Elton never thought about the Trust's termination distribution at the time the Trust was created, FMI cannot show a mistake of fact or law under Section 91-8-415.

¶84. While this Court has not addressed this exact issue, other courts have. In *In re Jeremy Paradise Dynasty Trust*, the Delaware trial court found that the settlor's failure to read, think about, or consider the trust provision at issue before the trust's execution was not a legally actionable mistake of fact or law. *In re Jeremy Paradise Dynasty Tr.*, No. 2021-0354-KSJM, 2023 WL 1241903, at *16 (Del. Ch. 2023). There, two brothers, Jeremy and Andrew, created two trusts to hold stock. *Id.* at *1. The "Jeremy Trust" was created to protect assets for the benefit of the brothers' mother and Jeremy's children. *Id.* "Each trust agreement provided for a 'Trust Protector,' and included a list of persons in 'position' to appoint, remove, and replace the Trust Protector[.]" *Id.* "Although an early draft of the Jeremy Trust Agreement placed Jeremy in the 'first position' with the right to select the Trust Protector, Andrew was in the first position under the final versions of both trust agreements." *Id.* "Jeremy did not know this because he did not read the Jeremy Trust Agreement before he signed it, despite being asked and given multiple opportunities to do so." *Id.* Upon learning that Andrew alone had the power to appoint, remove, and replace the Trust Protectors, Jeremy sought to reform the Jeremy Trust to place himself in the first position. *Id.*

¶85. Jeremy asserted a mistake in expression or inducement. *Id.* at *10. He claimed that

39

"had he been fully informed of what the final version of [the trust provision at issue] looked like, 'the Trust, with its present language, would never have been executed.'" *Id.* at *15. The court disagreed, stating:

> Jeremy did not plan to read the Trust Agreements for a few reasons. For one, he was distracted by important life events—his "son had just been born, or was about to be born." For another, he "just didn't have that much interest in" in the "tax stuff" and other matters. In response to Andrew's text, Jeremy wrote, "I'll sign whenever you tell me they are ready . . . . I'm just going to trust your edits." By this, Jeremy meant that he did not intend to read the drafts. And he did not read the drafts at the time. At most, he said, he "read a little bit" of the very first draft of the Jeremy Trust Agreement, but nothing beyond that. In late March, Jeremy "figured [his] brother was just taking care of everything" and testified that he "did not feel like participating or editing anything anymore."

*Id.* at *5 (alterations in original) (footnotes omitted).

¶86. The court noted that in order to prevail, "Jeremy must show that a mistake of fact or law caused him to sign the Jeremy Trust Agreement because, as written, he thought it reflected his control over the Jeremy Trust." *Id.* at *10. The court further noted:

> "A settlor's intent at the time a trust is established is the controlling inquiry; an intent developed after creating a trust is irrelevant for purposes of construing the trust."

> This court has held that a party's "general understanding" is insufficient to carry that party's burden. And a "plaintiff that has no belief [at all] is not mistaken."

*Id.* at *11 (alteration in original) (citations omitted) (footnotes omitted).

¶87. The court found that "Jeremy ha[d] not said or shown that, prior to March 11, he ever told anyone about his preference with respect to removal and replacement of the Trust Protector" and that "after-the-fact regret [wa]s not relevant to the intent inquiry." *Id.* at *13, 16. The court concluded that Jeremy failed to prove by clear and convincing evidence "that

40

he held a mistaken intent about [the applicable trust provision] at the time he executed" the agreement. *Id.* at *11.

¶88.    Here, as in *Paradise*, Elton did not read the Trust before its execution but, instead, trusted that his attorneys would "tak[e] care of everything." *Id.* at *5 (internal quotation mark omitted). Additionally, as in *Paradise*, Elton "has not said or shown that, prior to [1992], he ever told anyone about his preference[.]" *Id.* at *13. Instead, Elton testified that at the time he executed the Trust in 1992, he had not thought about or considered what would happen when the trust terminates. And like Jeremy in *Paradise*, Elton testified that had he read the Trust before execution, he would not have executed it. *Id.* at *15. But as the *Paradise* court found, a "plaintiff that has no belief [at all] is not mistaken[,]" *id.* at *11 (alteration in original) (internal quotation marks omitted) (quoting *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1155 (Del. 2002)), and "after-the-fact regret is not relevant to the intent inquiry." *Id.* at *16.

¶89.    The majority asserts *Paradise* is inapplicable because "Delaware has not adopted the [Uniform Trust Code]." Maj. Op. ¶ 53. But the Delaware court considered and addressed the same two factors, which are in Section 91-8-415, and are at issue in this case, i.e., whether "a mistake of fact or law . . . affected the specific terms of the document" and "the settlor's intention." *Id.* at *9 (alteration in original) (internal quotation mark omitted) (quoting Restatement (Third) of Trs. cmt. 6).

¶90.    The majority further asserts *Paradise* is inapplicable because "substantial evidence against reformation was submitted in *Paradise*" in that "the grantor willfully chose not to

41

read the trust document due to a lack of intent and life events." Maj. Op. ¶ 53. The majority claims that unlike Jeremy in ***Paradise***, Elton "did not show a willful ignorance of the drafting process and an outright refusal to participate." Maj. Op. ¶ 53. But as previously discussed, Elton admittedly did not read the Trust before its execution. Like Jeremy, Elton did not intend to read the document and he did not read the document at the time it was presented to him. ***Paradise***, 2023 WL 1241903, at *5. Instead, like Jeremy, Elton trusted his attorney and did not take an interest in the details. ***Id.*** Moreover, Elton admitted that he had not thought about, had not considered, and had not discussed with anyone, what would happen when the trust terminates. But again, a "plaintiff that has no belief [at all] is not mistaken." ***Id.*** at *11 (alteration in original) (internal quotation marks omitted) (quoting ***Cerberus Int'l, Ltd.***, 794 A.2d at 1155).

¶91. Additionally, in ***In re Estate of Duncan***, the petitioner attempted to reform an irrevocable trust despite no evidence that the scrivener conferred directly with the settlor regarding the provisions of an amendment. ***In re Est. of Duncan***, 232 A.2d 717, 722 (Pa. 1967). The court found "[i]t [wa]s impossible to find that the testimony clearly, precisely and convincingly establishe[d] the existence of a scrivener's error or mistake[.]" ***Id.*** "The only testimony concerning the mistake [wa]s that of the scrivener, twenty-three years after the event; who, at no relevant time, discussed the provisions of the amendment directly with the [s]ettlor." ***Id.*** As a result, the court found there was no mistake in draftsmanship necessary for reformation. ***Id.*** at 723.

¶92. Here, as in ***Duncan***, Elton never discussed with the scrivener, i.e., Keyes, his intent

42

regarding what would happen when the Trust terminates. *Id.* at 722. Elton admitted that he had not thought about and, as a result, had not discussed with anyone what would happen upon termination. In fact, Elton admitted that he never confirmed his intent. Because Elton had not considered it and had not discussed it with anyone, there can be no mistake in draftsmanship.

¶93.    The majority asserts:

> Elton testified that he instructed his attorney to create a Trust for the lifetime benefit of sixteen named individuals, including his ex-wife and his brother's ex-wife. Elton testified that his kids had been the main concern for his entire lifetime and that it was pretty obvious to him that his kids, being by far the youngest named beneficiaries, would be the last beneficiaries to survive. . . . He stated that he would not have continue[d] to grow the value of the trust "to take care of people that [he] d[id]n't even know and that maybe some of them not even born yet. It just doesn't make sense."

Maj. Op. ¶ 56. But while Elton's kids were his "main concern" and while it might have been "obvious to him," Elton failed to think about, express, or confirm what would happen when the Trust terminates, and he failed to read the Trust document, including the termination distribution provision.

¶94.    It is undisputed that Elton voluntarily signed the Trust and understood when he created the Trust in 1992 that it was irrevocable and not capable of amendment. By signing the Trust, Elton agreed to and accepted the terms and conditions of the Trust and, more importantly, he agreed and accepted that those terms and conditions were irrevocable and unamendable.

¶95.    As the majority notes, Elton was a successful businessman. Maj. Op. ¶ 53. He understood that what he was signing was an irrevocable trust, and he understood what that

meant. The fact that he failed to read the Trust and failed to think about certain Trust provisions before he signed it does not and should not affect the fact that he knowingly and wilfully signed a document he knew was irrevocable.

¶96. Elton's failures cannot constitute a mistake of fact or law necessary for reformation. If "I did not think about it" is a legally sufficient mistake of fact or law, then any living settlor may reform an unambiguous irrevocable trust. Irrevocable trusts are irrevocable for a reason. And Elton knew the trust document he signed was irrevocable. To allow reformation under these circumstances would jeopardize the law of irrevocable trusts.

¶97. Here, FMI has offered no evidence to establish an actionable mistake of fact or law under Section 91-8-415. The only mistake that has been established is that Elton chose not to read the Trust document when he created the Trust, and he chose to do business without reading documents. The Trust was created exactly the way Elton chose for it to be created. To do now what the Trust document specifically does not allow, i.e., change the terms of the Trust, "*absolutely destroy[s] the value of all contracts*[,]" especially trusts. *Tel-Com Mgmt.*, 782 So. 2d at 153 (emphasis added) (internal quotation mark omitted) (quoting *Hicks*, 580 So. 2d at 746).

¶98. Because Elton failed to meet the requirements of Section 91-8-415, the chancellor erred by reforming the trust. I would reverse the chancellor's final judgment reforming the irrevocable trust, and I would render judgment in favor of Respondents Gladys Cole Beebe, Gail Smith, Lance Smith, Brielle Smith, Candace Leak, Cole Leak, and Cydney Leak.

**RANDOLPH, C.J., JOINS THIS OPINION.**